DeALMEIDA, J.T.C.
This is the court’s opinion after trial in the above-referenced matter challenging the 2007 assessment by the Borough of Franklin Lakes on plaintiffs’ residence. For the reasons explained more fully below, the decision of the Bergen County Board of Taxation reducing the original assessment on the property is affirmed.
I. Findings of Fact
Plaintiffs Nazmi and Aida Elrabie are the owners of a single-family home on a .92-acre lot located at 319 Lynn Drive in the Borough of Franklin Lakes, Bergen County. The property is designated by the Borough as Block 2308.01, Lot 1.03. For tax year 2007, a year in which there was a municipal-wide revaluation in Franklin Lakes, the subject property was assessed as follows:
Land $ 580,000
Improvement $2,005,800
Total $2,585,800
Plaintiffs challenged the 2007 assessment before the Bergen County Board of Taxation. On July 23, 2007, the Board issued a judgment reducing the assessment as follows:
*163 Land $ 580,000
Improvement $1,820,000
Total $2,400,000
Plaintiffs filed an appeal with this court on August 31, 2007. The Borough did not file a counterclaim. The matter was tried on April 14, 2008. Two witnesses appeared at trial: an appraiser called by plaintiffs to testify as an expert witness with respect to the value of residential property and an appraiser called as defendant’s expert in the same field. The parties stipulated to the qualifications of both experts, and the court accepted that stipulation.[1]
*164 Based on the experts’ testimony, the court finds that plaintiffs’ residence was constructed in 1988 and has a total of fourteen rooms, including a kitchen, a dining room, a living room, six bedrooms, six full bathrooms and two half bathrooms.* [2] The two- *165 story home has a full brick exterior finish, casement windows, an asphalt roof, and a circular driveway. The basement of the home is unfinished. The backyard contains a patio, no pool, and limited landscaping. The property is located in a residential neighborhood and both parties offered photographs of a serene, suburban streetscape in the area of the home.
The court also finds that the residence has a tiled kitchen -with Formica countertops and laminate cabinets. The majority of the floors in the house are hardwood and the home has one fireplace. The bathrooms have tile floors and marble or granite countertops, except for the master bathroom, a photograph of which was admitted as evidence, which has a marble floor and marble steps leading to a bathtub. The parties agree that no capital renovations were made to the house since the date of purchase by plaintiffs in 2001. Plaintiffs placed into evidence several photographs showing slightly cracked tiles in one bathroom, a sink with fixtures that are discolored and flaking, and bathroom cabinets with peeling surfaces. The court finds that these photographs are evidence of ordinary wear and tear to a home that is approximately 20 years old, and which has not undergone any capital renovations, and are not indicative of a residence in a state of significant deterioration or disrepair.
The parties offered conflicting testimony regarding the size of plaintiffs’ residence. Plaintiffs’ expert testified that he calculated the habitable space in the home to be 6,886 square feet, using a tape measure during an in-person visit. A schematic of the measurements he took at the premises is included in his expert report. Defendant’s expert, on the other hand, testified that the residence is 7,543 square feet in size. According to him, an appraiser employed by his office measured the exterior of the home using a wheel to “cheek” the accuracy of “certain measurements” on the property card maintained by the municipality for the property. Defendant’s expert provided no further details regarding the number of measurements on the property cards *166 checked or how the appraiser determined which measurements to verify.
The experts offered little testimony to explain the 657-square-feet difference in their measurements. Plaintiffs’ expert testified that the discrepancy might be explained by a “two-story loft area” in the residence, although he did not elaborate on that assertion. Defendant’s expert offered no explanation for the discrepancy. Although no testimony was offered on the point, the court notes that the municipality’s property record card, upon which defendant’s expert relied in reaching his opinion, indicates that the “Livable Area” of the residence is 7,543 square feet and that the outdoor patio behind the house is 657 square feet. The measurement of the patio as reflected on the property record card is precisely the same as the difference between the two experts’ total-square-feet measurements.
Shortly after trial, the court offered the parties the opportunity to submit supplemental briefing addressing the question of whether the 657-square-feet difference in the measurements of gross living area is attributable to the patio and, if so, whether the patio area should be included in the overall size of the residence. In their supplemental letter brief, plaintiffs offer no opinion on whether the patio area accounts for the difference in gross living area measurements. However, plaintiffs contend that if the court finds that the 657-square-feet difference is attributable to the patio, that area should not be included in total gross living area because a patio is not finished, above-grade, residential space. Defendant responded through a certification of its tax assessor, Michael Leposky. Mr. Leposky certified that plaintiffs’ expert incorrectly measured “the two story area over the garage” and that his error in measurement “makes up for the majority of the difference between the borough’s measurements and the property owner’s measurements.” In addition, Mr. Leposky certifies that the property record card was compiled pursuant to the methods prescribed in the New Jersey Tax Assessor’s Manual and is entitled to a presumption of validity. Finally, Mr. Leposky certified that just prior to completing his certification he re-examined *167 the property and determined the measurements on the property record card to be correct.
The court finds that neither party has satisfactorily explained the discrepancy between the experts’ measurements of gross living space. However, based on the record, the court finds that the 657-square-foot discrepancy between the measurements is attributable to the patio area. Although the municipality attributes the difference to a second-story area above the garage, the tax assessor’s certification admits that this area, if included in plaintiffs’ expert’s calculation of the total gross living area of the residence, would account only for “the majority of” the discrepancy. The property record card, which defendant contends is accurate, attributes precisely 657 square feet to the patio area and given that the drawing accompanying plaintiffs’ expert report provides clear evidence that the areas of the home that he measured in person excludes the patio, the court finds that the gross living area of the Elrabie residence is 6,886 square feet, excluding the patio area from the total living space reported on the property record card.
Because this appeal concerns the 2007 tax year, the issue before the court is the value of the property on October 1, 2006. N.J.S.A. 54:4-23. Both experts used the comparable sales approach to estimating the value of the residence on that date. However, each expert selected comparable sales that differed from those selected by the other.
A. Plaintiffs’ Expert’s Approach to Vahte
Plaintiffs’ expert testified that in selecting comparable sales, his primary focus was on finding homes of a similar age to the subject with standard finishings, basic kitchens, unfinished basements, and standard bathrooms, regardless of the size of the residences. According to his testimony, plaintiffs’ home “from the outside ... appears to be significant. It is grand, it’s large. Upon entering the home it has very limited appeal. It has none of the creature amenities one would expect in a home of this size.” He testified that although the residence has “curb appeal,” typical buyers would put weight on the condition of a house and the quality of its *168 amenities rather than on its size when in the market for a home in the range of $2 million. He testified that, because the residence has not been renovated since at least 2001, and given the average quality of the amenities, the property should be compared 'with residences of similar age and condition, and with similar amenities, even if those residences are much smaller in size.
Plaintiffs’ expert testified that it is his opinion that homes similar in size to the Elrabie residence in Franklin Lakes would have “vast amenities” of superior quality, requiring large adjustments to the sales prices to make them truly comparable to plaintiffs’ home. He determined that it would be more appropriate to use comparable sales of smaller homes in similar condition and to make adjustments based on square footage. He testified that square footage is a concrete number which can be assigned a certain value per square foot, as opposed to adjustments based on the condition of amenities, which would require more subjective estimates of value.
On cross-examination, plaintiffs’ expert admitted that in most cases when reaching an opinion as to the value of a residence, he would use comparable sales of properties of about the same size as the subject property and make adjustments for any differences in the quality of amenities, but that in this case he “went a different route” because of the condition of the Elrabie house. He also conceded that his search for comparable sales produced sales of homes of approximately the same size as the subject property that he could have used and adjusted for condition of the property in reaching his opinion. His search for comparable sales produced no sales of residences similar in size to the Elrabie residence with limited amenities.
Plaintiffs’ expert adjusted the comparable sale prices by $75 per square foot for differences in the size. In some instances, the comparable sales selected by plaintiffs’ expert were between 26% and 37% smaller in size than the Elrabie residence. Other adjustments made by plaintiffs’ expert were $50,000 per acre for lot size, $10,000 per bathroom, $5,000 per half bathroom, $25,000 for a finished basement, $5,000 per fireplace, and $25,000 per pool. *169 He made no adjustments based on the age of the residence, even though two of his comparable sales were more than 10 years older than the Elrabie residence.
In addition, plaintiffs’ expert limited his selection of comparable sales to those taking place no earlier than April 2006. He testified that he was of the opinion that market conditions in 2005 were sufficiently different from those in 2006 to make sales from 2005 of little use in determining the value of plaintiffs’ residence on October 1, 2006. He made no time adjustments to the sale prices, given the closeness in time of the comparable sales to October 1, 2006 and his opinion that the “market was flattening out” in October 2006.[3]
Plaintiffs’ expert’s comparable sales and adjustments to the subject can be summarized as follows:
*170 [[Image here]]
Plaintiffs’ expert averaged the adjusted prices of the comparable sales and rounded down to reach a final opinion that the value of plaintiffs’ property was $1,800,000 on October 1, 2006. This estimate equates to $261.40 per square foot for the 6,886 square feet of gross living space in plaintiffs’ home. The average price per square foot of the subject based on the comparable sales selected by plaintiffs’ expert after his adjustments is $263.66. These numbers differ because of the expert’s rounding down of the average adjusted price of the comparables.
B. Defendant’s Expert’s Approach to Value
Defendant’s expert testified that the more appropriate approach to selecting comparable sales is to select homes of similar size, even if they are newer and have higher quality amenities than the *171 subject. Adjustments for the quality of amenities, according to defendant’s expert, will result in a more accurate conclusion of value than would a comparison of homes of smaller size, but with amenities of similar quality to the subject’s amenities. He therefore selected four comparable sales of homes considerably larger in size than those selected by plaintiffs’ expert, but closer in size to the subject property.
Defendant’s expert adjusted the prices of the comparable sales by $100 per square foot of living area, $5 per square foot of lot size, 5% for good condition as compared to very good condition, $25,000 per full bath, $15,000 per half bath, $75,000 per fully finished basement, and $75,000 per swimming pool. He also made a positive time adjustment of 5% per year for sales prior to October 1, 2006, the valuation date for 2007 assessments, based on his testimony that real estate values in Franklin Lakes were increasing during the time between the dates on which the comparable sales took place and October 1, 2006.
Defendant’s expert’s comparable sales analysis is summarized below. Adjustments to the expert’s figures have been made to account for the court’s finding that the total living area of the Elrabie home is 6,886 square feet.
*172 [[Image here]]
Defendant’s expert reached a final opinion of value by averaging the adjusted sales prices of the comparable sales and rounding down to $2,600,000. A similar result is reached by averaging the adjusted sales prices of his comparable sales after adjustment for the court’s holding that the Elrabie home has a total of 6,886 square feet of gross living space. The expert’s opinion that the value of plaintiffs’ property is $2,600,000 reflects a value of $377.58 per square foot for 6,886 square feet of gross living space. The average of the per-square-foot of the subject based on defendant’s expert’s adjusted comparable sales is $380.60. These figures differ because he x’ounded down the average of the adjusted px’iee of the comparables.
Dux’ing ci’oss-examination, defendant’s expex-t cx’edibly testified that although he did not inspect the intex’iox*s of his conxparable sales, he obtained inforixxation about the intex'iors of the comparable sales from the records of the company x’etained by the Borough to pex’fox’m the 2007 revaluation, the multiple listing sexwice, and brokex-s who were involved in the eompax-able sales. *173 Defendant’s expert testified that his opinion of value would not change if he knew that the comparable sales had amenities such as marble floors, cherry paneling throughout the home, custom made kitchens, his and her bathroom fixtures, superior landscaping, man-made ponds, Brazilian wood floors, bars, and similar amenities. He testified that he considered all such amenities to relate to the condition of the comparable homes, all of which he rated as being in very good condition. He rated the Elrabie home as being in good condition because of lesser quality amenities, requiring downward adjustments of 5% of the price of the comparable sales. These adjustments resulted in reductions ranging from $123,000 to $154,000. In addition, defendant’s expert testified that he accounted for a second kitchen in the basement of the comparable sale at 780 Apple Ridge, by reducing the sale price by $75,000 for a finished basement.
In addition to the expert report of defendant’s expert described in footnote 1 above, the record contains the following exhibits admitted into evidence: (1) the report of plaintiffs’ expert; (2) the multiple listing service reports for defendant’s expert’s comparable sales; (3) eight photographs of the interior of the Elrabie residence; (4) the property record card maintained by Franklin Lakes for the subject property; and (5) a photograph of the front of the Elrabie residence.
II. Conclusions of Law
The court’s analysis begins with the well-established principle that “Lo]riginal assessments and judgments of county boards of taxation are entitled to a presumption of validity.” MSGW Real Estate Fund, LLC v. Bor. of Mountain Lakes, 18 N.J.Tax 364, 373 (Tax 1998). As Judge Kuskin explained, our Supreme Court has defined the parameters of the presumption as follows:
The presumption attaches to the quantum of the tax assessment. Based on this presumption the appealing taxpayer has the burden of proving that the assessment is erroneous. The presumption in favor of the taxing authority can be rebutted only by cogent evidence, a proposition that has long been settled. The strength of the presumption is exemplified by the nature of the evidence that is required to overcome it. That evidence must be “definite, positive and certain in quality and quantity to overcome the presumption.”
*174 [Ibid, (quoting Pantasote Co. v. City of Passaic, 100 N.J. 408, 413, 495 A.2d 1308 (1985) (citations omitted)).]
 The presumption of correctness arises from the view “that in tax matters it is to be presumed that governmental authority has been exercised correctly and in accordance with law.” Pantasote, supra, 100 N.J. at 413, 495 A.2d 1308 (citing Powder Mill, I Assocs. v. Township of Hamilton, 3 N.J.Tax 439 (Tax 1981)); see also Byram Twp. v. Western World, Inc., 111 N.J. 222, 544 A.2d 37 (1988). The presumption remains “in place even if the municipality utilized a flawed valuation methodology, so long as the quantum of the assessment is not so far removed from the true value of the property or the method of assessment itself is so patently defective as to justify removal of the presumption of validity.” Transcontinental Gas Pipe Line Corp. v. Township of Bernards, 111 N.J. 507, 517, 545 A.2d 746 (1988).
“The presumption of correctness of a county board’s tax assessment judgment stands, until sufficient competent evidence to the contrary is adduced.” Little Egg Harbor Twp. v. Bonsangue, 316 N.J.Super. 271, 285-86, 720 A.2d 369 (App.Div.1998); Atlantic City v. Ace Gaming, LLC, 23 N.J.Tax 70, 98 (Tax 2006). “In the absence of a R. 4:37-2(b) motion ... the presumption of validity remains in the case through the close of all proofs.” MSGW, supm, 18 N.J.Tax at 377. In making the determination of whether the presumption has been overcome, the court should weigh and analyze the evidence “as if a motion for judgment at the close of all the evidence had been made pursuant to R. 4:40-1 (whether or not the defendant or plaintiff actually so moves), employing the evidentiary standard applicable to such a motion.” Ibid. The court must accept as true the proofs of the party challenging the assessment and accord that party all legitimate favorable inferences from that evidence. Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 535, 666 A.2d 146 (1995)). In order to overcome the presumption, the evidence “must be ‘sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.’ ” West Colonial Enters., LLC v. City of East Orange, 20 N.J.Tax 576, 578-79 (Tax 2003) *175 (quoting Lenal Props., Inc. v. City of Jersey City, 18 N.J.Tax 405, 408 (Tax 1999), aff'd, 18 N.J.Tax 658 (App.Div.), certif. denied, 165 N.J. 488, 758 A.2d 647 (2000)).
Only after the presumption is overcome with sufficient evidence at the close of trial must the court “appraise the testimony, make a determination of true value and fix the assessment.” Rodwood Gardens, Inc. v. City of Summit, 188 N.J.Super. 34, 38-39, 455 A.2d 1136 (App.Div.1982) (citations omitted). If the court determines that sufficient evidence to overcome the presumption that the assessment is correct has not been produced, the assessment shall be affirmed and the court need not proceed to making an independent determination of value. Ford Motor Co. v. Township of Edison, 127 N.J. 290, 312, 604 A.2d 580 (1992); Global Terminal & Container Serv. v. City of Jersey City, 15 N.J.Tax 698, 703-04 (App.Div.1996).
The court finds that plaintiffs have produced sufficient evidence to overcome the presumption of correctness attached to the county board judgment. If taken as true, the opinion of plaintiffs’ expert and the facts upon which he relied create a sufficient question regarding the correctness of the county board’s judgment to allow the court to make an independent determination of the value of plaintiffs’ property. Plaintiffs produced sufficient evidence to suggest that the condition of the residence, its relative lack of amenities when compared to homes of similar size, and the fact that no significant renovations have been undertaken at the property since at least 2001, raise a question regarding the value of the residence and whether those factors were properly considered when the county board arrived at its judgment.
Of course, a finding that the taxpayers have overcome the presumption of correctness does not equate to a finding that the county board judgment is erroneous. To the contrary, plaintiffs’ overcoming the presumption merely permits the court to address the question of what value should be accorded to plaintiffs’ property as of the operative valuation date. Once the presumption is overcome, the “court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the *176 matter based on a fair preponderance of the evidence.” Ford Motor Co., supra, 127 N.J. at 312, 604 A.2d 580. Our Supreme Court has held that “although there may have been enough evidence to overcome the presumption of correctness at the close of plaintiffs case-in-chief, the burden, of proof remain[s] on the taxpayer throughout the entire ease ... to demonstrate that the judgment under review was incorrect.” Id. at 314-15, 604 A.2d 580 (citing Pantasote Co. v. City of Passaic, supra, 100 N.J. at 413, 495 A.2d 1308). The court will, therefore, proceed to determine the value of plaintiffs’ property as of October 1, 2006.
A. Value as of October 1, 2006
Both experts used the comparable sales approach to estimating the value of plaintiffs’ property. The comparable sales approach is generally accepted as an appropriate method of estimating the value of a single-family residence. See Brown v. Borough of Glen Rock, 19 N.J.Tax 366, 377 (App.Div.2001); Appraisal Institute, The Appraisal of Real Estate, 419 (12th ed. 2001) (the comparable sales approach “usually provides the primary indication of market value in appraisals of properties that are not usually purchased for their income-producing characteristics.”). This method of valuation has been defined as “[a] set of procedures in which a value indication is derived by comparing the property being appraised to similar properties that have been sold recently, applying appropriate units of comparison, and making-adjustments to the sale prices of the comparables based on the elements of comparison.” Id. at 417. The court finds that this approach is the best method for determining the true value of plaintiffs’ residence.
The parties rely on disparate collections of comparable sales. As explained above, plaintiffs’ expert selected comparable sales significantly smaller in gross living area than plaintiffs’ residence, but with similar amenities. He thereafter made adjustments to the prices of the comparable sales to account for the larger size of plaintiffs’ home, along with other adjustments for number of rooms, pools, finished basements and the like. Defendant’s expert began from the premise that the most reliable approach to select *177 ing comparables is to select homes of similar size, making adjustments for the quality and quantity of amenities. He, therefore, selected comparable sales of residences of approximately the same gross living area as plaintiffs’ residence and made adjustments to the sale price for the fact that plaintiffs’ home lacks the superior quality and nature of the amenities of the comparable sale homes.
The court finds that the approach to valuation taken by defendant’s expert is more credible than the approach to valuation taken by plaintiffs’ expert. Defendant’s expert credibly testified that the comparison of houses of similar size, with adjustments for the quality and amount of amenities, produces a more accurate measure of value than does a comparison of homes of differing size with similar amenities, requiring adjustments based on gross living space. Plaintiffs’ expert confirmed this observation when he admitted during his testimony that he generally compares residences with similar amounts of gross living space when reaching an opinion of value. Although plaintiffs’ expert testified that he departed from his usual practice in this case because of the condition of the Elrabie residence, the evidence admitted at trial does not support the conclusion that his departure from general practice was justified.
The court finds that the testimony and photographs admitted into evidence establish that the Elrabie home has limited amenities of good, but not extraordinary, quality. Nothing in the record suggests that the number and quality of amenities in plaintiffs’ home are so lacking for a home of its size that a comparison with significantly smaller homes is justified. The court finds that plaintiffs’ home shows signs of the wear and tear one might reasonably expect to be present in a house in which no significant capital improvements have been made in at least seven, and possibly as many as twenty, years. The court finds, however, that the Elrabie home is not in such a state of disrepair or so lacking in amenities that the value of the home is affected beyond a downward percentage adjustment for the higher quality amenities found in the comparable sales selected by defendant’s expert. That expert made an overall downward adjustment of 5% to account for the condition of the Elrabie home as compared to the *178 comparable sales, as well as significant adjustments for pools, finished basements, and the number of rooms. The court finds those adjustments to be appropriate and sufficient to account for the state of the amenities in plaintiffs’ residence.
Plaintiffs argue that the comparable sales selected by-defendant’s expert are homes of uncommon elegance and size, specially constructed or renovated to attract the highest level purchasers and are, therefore, inappropriate for comparison to plaintiffs’ residence. While the court agrees that defendant’s expert’s comparable sales are large and feature high-quality amenities, the court finds that those homes are not so much grander than the Elrabie residence as to render them not probative of the value of the subject property. Of the four comparable sales selected by defendant’s expert, two are smaller than the plaintiffs’ home, two have fewer bathrooms, and one had a net upward adjustment in price, belying plaintiffs’ claim that defendant’s comparable sales are of homes so grand as to render their sale prices unreliable indicators of value. Comparable sales must be “sufficientLly] similar[ ] in some significant respects to permit ... the fact-finder, to draw rational probative valuation inferences from the sales cited.” Ford Motor Co., supra, 127 N.J. at 307, 604 A.2d 580 (citation omitted). All of defendant’s comparable sales are sufficiently similar to plaintiffs’ home, a 6,886-square-foot, fourteen-room residence with a three-car garage in an upscale residential neighborhood, to warrant significant weight in the court’s analysis of value, once appropriate adjustments are made.
The comparables offered by plaintiffs, however, are too dissimilar from plaintiffs’ home, particularly in size, to carry much weight. Plaintiffs’ expert’s selection of comparable sales, which departed from his ordinary practice of comparing homes of similar size to the subject property, are less probative of the value of plaintiffs’ residence than those offered by defendant and are, therefore, largely discounted by the court. The court finds that plaintiffs’ expert’s opinion of value, at $261.40 per square foot of living space, for a home of the size, type, and location of plaintiffs’ residence, lacks credibility.
*179 The court accepts as credible defendant’s expert’s 5% per year positive adjustment to the price of his comparable sales that took place prior to October 1, 2006, based on his testimony that real estate values in Franklin Lakes were increasing during the time between the dates on which the comparable sales took place and the operative valuation date. Defendant’s expert has extensive experience with the real property market in Franklin Lakes, having served as the Borough’s appraisal expert for nearly 20 years and having assisted in the municipal revaluation in 2007. Although plaintiffs expert offered his opinion that the Franklin Lakes real estate market “was flattening out in October 2006,” he offered no further testimony to support his conclusion. Given the fact that the burden of proof rests with the plaintiffs, and in light of the credible nature of defendant’s expert’s opinion of the value of real estate in Franklin Lakes, one of the premier residential communities in Bergen County, the court accepts a positive 5% per year adjustment to sales prices of the municipality’s comparable sales over the time period from the date of the comparable sales to October 1, 2006.
Having found credible defendant’s expert’s approach to estimating the value of plaintiffs’ residence, and having accepted as credible the adjustments to the sales prices of the comparable sales selected by him (after adjustment for the court’s finding that plaintiffs’ residence has 6,886 square feet of living space), the court finds defendant’s expert’s estimate of value also to be credible. The court finds that an averaging of the adjusted prices of four comparable sales sufficiently similar to plaintiffs’ home to be probative of its value is a credible method of determining the value of the subject property. The court concludes, therefore, that the value of plaintiffs’ residence on October 1, 2006 was $2,600,000.
III. Available Relief
Having resolved the question of the value of plaintiffs’ property, the court is faced with the question of whether this court is limited in the relief it may grant in this matter. Two factors have primary influence on the resolution of this question. The first is that Franklin Lakes underwent a municipal-wide revalua *180 tion for tax year 2007. N.J.S.A. 54:51A-6, commonly known as Chapter 123 (see L.1973, c. 123), is, therefore, not applicable and the Director’s average ratio is considered to be 100%. N.J.S.A. 54:51A-6d; Brown, supra, 19 N.J.Tax at 373. The second is that Franklin Lakes neither timely appealed from the judgment of the county board lowering the original assessment, N.J.S.A. 54:51A-9a; R. 8:4—1(a)(2), nor filed a timely counterclaim. Mase Land Co. v. Township of Jefferson, 20 N.J.Tax 439 (Tax 2002); Throckmorton v. Township of Egg Harbor, 12 N.J.Tax 419 (Tax 1992), rev’d on other grounds, 267 N.J.Super. 14, 630 A.2d 794 (App.Div. 1993). Compare Campbell Soup Co. v. City of Camden, 16 N.J.Tax 219, 224 (Tax 1996) (holding that when a timely Complaint is filed in this court challenging the judgment of a county board of taxation a counterclaim may be filed within 35 days after service of the Complaint pursuant to R. 8:4-3 and R. 4:6-1).
It is well established that in a revaluation year, absent a timely appeal or counterclaim by the taxing district, this court may not increase an original tax assessment, unless the taxpayer establishes a discrimination claim or the court finds that the quantum of the assessment is so far removed from true value as to suggest that the original assessment methodology was patently arbitrary or capricious. F.M.C. Stores Co. v. Borough of Morris Plains, 100 N.J. 418, 431, 495 A.2d 1313 (1985). Plaintiffs have not established a claim of discrimination in any sense and the court finds no evidence in the record that the quantum of the assessment is so far moved from true value that it reflects an arbitrary or capricious assessment methodology. The court, therefore, cannot raise the assessment on plaintiffs’ property above the original assessment of $2,585,000.
The question remains, however, whether the municipality’s failure to file an appeal or counterclaim with this court challenging the county board’s determination limits the court’s ability to set an assessment for plaintiffs residence above the $2,400,000 assessment established by that body. The Supreme Court’s holding in F.M.C. Stores, supra, while addressing the question of whether the court can increase an original assessment in a revaluation year in the absence of a municipal appeal or counterclaim, is instructive *181 on the question before this court: whether the county board’s judgment reducing an assessment in a revaluation year may be increased where the taxing district has not sought such relief in an affirmative pleading.
In F.M.C. Stores, three taxpayers filed direct appeals in this court challenging the assessments made on their properties during a revaluation.[4] The taxing district did not file a Complaint in this court or a timely Counterclaim in response to the taxpayers’ pleadings. The township thereafter moved for leave to file as if within time counterclaims seeking to increase the original assessments. Although this court granted those motions, the Supreme Court ultimately held that the late counterclaims could not be filed and, as a result, this court could not enter judgment increasing the original assessments, even if the evidence at trial established that the value of the properties exceeded their assessments. In limiting the ability of this court to increase the original assessments, the Supreme Court relied on several factors relevant to the issue raised here.
First, the Court underscored the importance of compliance with statutory time limits for asserting claims in tax matters. In rejecting the taxing district’s request to assert its untimely counterclaims the Court relied on the long-established principle that “[sjtriet adherence to statutory time limitations is essential in tax matters,” F.M.C. Stores, supra, 100 N.J. at 424, 495 A.2d 1313, (citing Princeton Univ. Press v. Princeton Bor., 35 N.J. 209, 214, 172 A.2d 420 (1961) and New York, Susquehanna, and W.R.R. v. Vermeulen, 44 N.J. 491, 210 A.2d 214 (1965)) and held that “taxing-districts are required to comply with the time prescriptions for the filing of tax appeals.... ” Ibid. The Supreme Court reasoned that having failed to establish jurisdiction in this court to entertain a claim to increase an original assessment in a revaluation year, the *182 municipality could not circumvent the statutory time limits for asserting its counterclaim through leave to file a late counterclaim.
Second, the Court rejected the argument that a taxpayer would have an unfair advantage if a municipality lost the leverage of pursuing an increase in an original assessment merely because the taxing district failed to file a timely counterclaim. The taxing district’s claim in this regard appeared to be premised, at least implicitly, on the proposition that a taxpayer may file its Complaint on the final day of the statutory period for doing so, thereby depriving the municipality of the opportunity to evaluate the Complaint and assert a counterclaim in order to gain a litigation advantage or, at least, litigation parity. The Court held that a “taxing district does not stand in the shoes of an ordinary citizen” and that municipal officials must “act solely in the public interest.” Id. at 426,495 A.2d 1313. “In dealing with the public, government must ‘turn square corners.’ ” Ibid, (quoting Gruber v. Mayor and Twp. Comm., 73 N.J.Super. 120, 179 A.2d 145 (App.Div.), aff'd, 39 N.J. 1, 186 A.2d 489 (1962)). “Similarly,” the Court noted, “the statutory provisions governing substantive standards and procedures for taxation, including the administrative review process, are premised on the concept that government will act scrupulously, correctly, efficiently, and honestly.” Id. at 427, 495 A.2d 1313. “To that end, it is expected that it will make proper assessments, which are accorded a strong presumption favoring their validity.” Ibid. “It follows that a municipality should undertake to appeal its own assessment only when it has good cause to believe the assessment does not reflect true value, and not simply to achieve a tactical advantage over, or even strategic parity with, a taxpayer that has independently appealed the assessment” in a timely fashion. I bid[5]
*183 Third, the Court declined to vest the Tax Court with authority to raise an original assessment in a revaluation year whether or not the municipality has filed a counterclaim. While precedents allow the Tax Court to raise an assessment in the absence of a municipal counterclaim in discrimination cases and to ensure that an assessment is within the common range because of “overriding policies involved in such ... case[sj,” the Court found that “[n]o such transcendent constitutional or statutory policies arise upon the assertion by a taxing district that its assessment was mistaken or has been erroneously calculated” in a revaluation year. Id. at 428, 495 A.2d 1313. The Court concluded with the observation that although appeals before the Tax Court are de 'novo, see N.J.S.A. 54:3-21, this court’s “right to make an independent assessment is not boundless” and must “be consistent with the issues as framed by proper pleadings....” Id. at 430, 495 A.2d 1313 (citing Pantasote, supra, 100 N.J. at 413, 495 A.2d 1308).
The practical and legal consequences of the Supreme Court’s decision in F.M.C. Stores were analyzed at length by Judge Axelrad in Campbell Soup Co., supra. In that case, the taxpayer filed appeals with this court challenging the county board’s decisions regarding the assessment of property in two non-revaluation years. Campbell Soup Co., supra, 16 N.J.Tax at 221. Although the City filed a timely counterclaim in one of the years, it failed to do so in the other. Ibid. After trial, the taxpayer moved to suppress all evidence submitted by the City suggesting that the original assessments should be increased, arguing that the taxing district’s failure to file a counterclaim in the one tax year precluded a judgment from the court increasing the original assessment. *184 Id. at 221-22. The court denied the motion, concluding that Chapter 123 authorized this court to increase an original assessment in a non-revaluation year, even in the absence of a counterclaim, in order to bring the assessment in question into the common level range. The court noted that “[m]uch of-the basis for” its decision “turns on [the] distinction” that the assessments before the court in that ease were for non-revaluation years and that Chapter 123 applied to the taxpayer’s claims. Id. at 226.
The court explained that Chapter 123, which must be applied by the Tax Court when deciding value in a non-revaluation year, N.J.S.A. 54:51A-6, was enacted to address the complex evidentiary questions raised by a taxpayer’s claim that property was assessed outside a common level of assessment in non-revaluation years. Prior to enactment of the statute (Chapter 123), the burden of proving a common level of assessment in a non-revaluation year fell on the taxpayer resulting in a “particularly difficult and expensive undertaking, requiring taxpayers to employ experts to perform complex statistical evaluations of the area.” Id. at 228 (citing Murnick v. City of Asbury Park, 95 N.J. 452, 459, 471 A.2d 1196 (1984)). In In re Kents 2124 Atlantic Ave., Inc., 34 N.J. 21, 166 A.2d 763 (1961), the Supreme Court recognized the issue and invited a legislative response. Id. at 228. The Legislature responded with the enactment of Chapter 123, which defined “average ratio” and established a “common level range” or corridor allowing for leeway in the assessment. Ibid, (citing Murnick, supra, 95 N.J. at 460, 471 A.2d 1196). Because, “for obvious reasons, a common level is easily determinable” in revaluation years, id. at 227-28, Chapter 123 expressly excludes its applicability to yeai-s in which revaluations have been implemented.
“In a non-revaluation year Chapter 123 provides authority for the court to raise an assessment, even in the absence of an affirmative request by the taxing district.” Id. at 228. “In this respect Chapter 123 operates substantively in the nature of an automatic counterclaim.” Ibid. As Judge Axelrad explained, “[t]he existence of Chapter 123 itself puts taxpayer on notice that its assessment might be increased even in the absence of a *185 municipal counterclaim.” Ibid, (citing Weyerhaeuser Co. v. Closter Bor., 190 N.J.Super. 528, 542, 464 A.2d 1156 (App.Div.1983)). “This is the risk taxpayer took when it appealed” an assessment in a non-revaluation year. Ibid.
As Judge Axelrad further explained,
Lijn a revaluation year, however, where Chapter 123 does not apply, taxpayer is without notice of the possibility of an increase in the assessment. Due to the recent valuation of the subject property by the assessor, taxpayer would have no reason, absent some affirmative claim, to believe the municipality was not standing by its assessment. In order not to disturb taxpayer’s justified reliance on the fact its assessment is not being' challenged as too low, public policy mandates the Tax Court may not automatically increase an assessment in the absence of a counterclaim.
LId. at 229.]
The rationale underlying the holding in F.M.C. Stores as illuminated in Campbell Soup Co. supports the conclusion that this court may not increase the assessment beyond the amount set by the county board in the absence of a Complaint or counterclaim by the municipality affirmatively seeking an increase in the county board’s judgment.
As noted above, statutory filing deadlines are strictly enforced in tax proceedings and municipalities must turn square corners when interacting with taxpayers. Here, Franklin Lakes failed to file a Complaint or counterclaim challenging the county board’s decision within the time provided by law. Had the municipality been dissatisfied with the county board’s judgment it had the obligation to evaluate the board’s decision and determine whether to file a Complaint or a timely counterclaim. Having not taken advantage of either of those avenues for judicial redress, the taxing district did not establish jurisdiction in this court to increase the assessment beyond the amount set in the judgment of the county board. Such relief has not been “framed by proper pleadings,” F.M.C. Stores, supra, 100 N.J. at 430, 495 A.2d 1313, and is not, therefore, available to the municipality. See Rabstein v. Township of Princeton, 187 N.J.Super. 18, 24-25, 453 A.2d 553 (App.Div.1982) (holding that the taxing district’s failure to assert a timely claim seeking an increase in the original assessment at the county board precluded subsequent relief in this court).
*186 Moreover, like the taxpayers in F.M.C. Stores, the plaintiffs here were not put on notice that the municipality sought to increase the assessment beyond the amount set by the county board. While it is true that Franklin Lakes defended its original assessment before the county board, it would be reasonable for the taxpayers to conclude that the municipality was satisfied with the reduction of the assessment to $2,400,000 when the taxing-district did not file a Complaint or counterclaim within the time permitted by law. See Borough of Matawan v. Tree Haven Apartments, Inc., 108 N.J.Super. 111, 118, 260 A.2d 235 (App.Div.1969) (holding that basic fairness requires that taxpayers, particularly those appearing pro se, be put on notice when a taxing district is seeking an increase beyond that requested in the district’s Complaint appealing a county board judgment reducing the original assessment).
This is not a situation in which Chapter 123 puts the taxpayers on notice that the Tax Court might increase the assessment set by the county board. By its express terms Chapter 123 does not apply in a revaluation year. N.J.S.A. 54:51A-6d. As a result, the court cannot reasonably conclude that plaintiffs are deemed to be aware of a statutory provision permitting the increase in the county board’s judgment. To the contrary, a plain reading of the statute could reasonably lead a taxpayer to conclude that an increase in the assessment set by the county board was not an option, absent an affirmative claim for relief by the municipality. The court, therefore, may not raise the assessment beyond the amount set by the county board.[6]
*187 A Judgment affirming the decision of the Bergen County Board of Taxation will be entered by the Tax Court Clerk.

 The reports of both experts were moved into evidence. Plaintiffs objected to the admission of defendant's expert's report based on his testimony that he did not personally inspect the interior of plaintiffs' residence prior to reaching an opinion on value. The court reserved decision on the objection to permit the parties to submit memoranda explaining their positions. Plaintiffs contend that the expert violated the Uniform Standards of Professional Appraisal Practice ("USPAP"), which require that an appraisal report include a certification specifying that the signator had personally inspected the property. Plaintiffs argue that this departure from standard practice requires that his report be excluded from evidence. In addition, plaintiffs argue that N.J.A.C. 18:12A-1.9(k), which precludes testimony before a county board of taxation of an appraiser who did not personally inspect the relevant property, requires that the report not be admitted into evidence. Defendant argues that a personal inspection of a residence is not a prerequisite for acceptance of an expert's report on value. In addition, defendant notes that its expert obtained information regarding the interior of the Elrabie residence from an appraiser he employs who inspected the house, from individuals who conducted the 2007 revaluation, and from the multiple listing service, the same service used by plaintiffs’ expert to obtain information regarding the interiors of homes he used as comparable sales. Defendant argues that the court is in a position to weigh the value of defendant's expert's report based on his testimony regarding how he collected data on the interior of plaintiffs' residence and need not exclude his report. The Appellate Division's decision Jablin v. Borough of Northvale, 13 N.J.Tax 103 (App.Div.1991), is on point and supports defendant's position. In Jablin, the taxpayer objected to the admission of expert testimony from an appraiser who did not inspect property that was the subject of a trial at which value was in dispute. In that case, both the appraiser and an associate from his office signed the appraisal report, but only the associate certified that he inspected the property. Id. at 106. The expert testified that although he did not inspect the interior of the building, he did inspect the site of the properly and reviewed the information gathered by his associate. Ibid. The trial court allowed the expert to testify. The *164 Appellale Division affirmed. That court rejected the taxpayer’s reliance on NJ.A.C. 18:12A-1.9(k) because that rule "applies to matters before a county board ... and is not applicable to matters before the Tax Court.” Ibid. In addition, the court affirmed Judge Hopkins’ conclusion that former NJ.R.E. 56(2), now NJ.R.E. 703, which allows an expert to testify based on "facts or data ... made known to him at or before the hearing" and NJ.S.A. 2A:83-1, which allows expert testimony in the Tax Court on comparable sales based on knowledge obtained from third parties, allowed the admission of the expert's testimony. Id. at 106-07 (quoting from the text of former NJ.R.E. 56(2)). The court concluded, "[w]e agree with the tax judge’s view that the issue really speaks to the weight to be accorded [the expert’s] testimony as opposed to its admissibility." Id. at 107. Although the Appellate Division’s opinion does not mention the expert’s report, it is clear that if an expert may testify then his or her report may be admitted into evidence to assist the court in evaluating the expert’s testimony, a common practice in this court. See Little Egg Harbor Twp. v. Bonsangue, 316 N.J.Super. 271, 280, 720 A.2d 369 (App.Div 1998). Here, defendant’s expert’s appraisal report was signed by both the expert and an appraiser he employs. The report contains a certification indicating that only the employee personally inspected plaintiffs' property, a fact candidly admitted by defendant's expert at trial. However, the court finds that defendant provided a sufficient basis for the admission of its expert report. The employee reported his observations at the Elrabie house to defendant's expert, who visited the site of the Elrabie home, has extensive experience with housing in Franklin Lakes, is familiar with the types of amenities generally found in those homes, and collected information from municipal records, brokers, and other sources generally relied upon by experts in his field. The court finds that defendant’s expert had a sufficient basis upon which to opine on the value of plaintiffs’ residence, rendering his testimony and report admissible.

 The record reveals a discrepancy in the evidence with respect to the number of bathrooms in the residence. Plaintiffs’ expert’s report indicates that the home contains six and a half bathrooms. Defendant’s expert's report indicates that the home contains six full and two half baths. The property record card maintained by the Borough, and which was admitted as evidence, indicates that the home has six full and two half bathrooms. Defendant's expert testified that he relied on the property record card in reaching his opinion of the value of plaintiffs’ property and this apparently serves as the basis for his opinion on the number of bathrooms. Plaintiffs’ expert did not explain the basis for his view that the home has only one half bath. The court finds defendant's expert's description of the number of bathrooms supported by the record and concludes that the Elrabie residence has six full and two half bathrooms. Plaintiffs’ expert testified that he attributed $5,000 of value to a half bathroom. His calculations of value, detailed *165 in the chart below have been adjusted to reflect the court's findings on the number of bathrooms.

 Although plaintiffs’ expert provided testimony regarding the proximity of the subject property to Route 208, a main thoroughfare in Franklin Lakes, lie did not make any adjustments to the comparable sales based on location. Nor did he proffer testimony that the relationship of plaintiffs’ house to Route 208 affected its value.

 "Although this fact is not readily ascertainable upon even a thorough reading of the Supreme Court’s decision in F.M.C., the lower court's decision clearly sets forth that the tax year in question was, in fact, a revaluation year. F.M.C. Stores Co. v. Borough of Morris Plains, 195 N.J.Super. 373, 378, 384, 479 A.2d 435 (App.Div. 1984).” Campbell Soup Co., supra, 16 NJ.Tax at 226 n. 2.

 At the time that F.M.C. Stores was decided, the time in which to file appeals to the county board of taxation, Complaints with this court in a direct appeal or counterclaims in either forum were coterminous. In response to the Supreme Court's holding in F.M.C. Stores, the Legislature amended N.J.S.A. 54:3-21 to provide that when an appeal is filed with the county board of taxation or a complaint is filed with this court in a direct appeal from the assessment on the final day of the statutory period or in the 19 days next preceding the final day of *183 the statutory period, a taxpayer or taxing district may file a cross-petition with the county board or a counterclaim with this court within 20 days from the date of service of the initial pleading. L. 1987, c. 185. Because this matter concerns an appeal to this Court from a judgment of the county board, N.J. SA. 54:51A-9a controls and Franklin Lakes had 45 days from the date of service of the county board's judgment to challenge that judgment in this court. See, e.g., Mase Land Co., supra, Throckmorton, supra. Compare Campbell Soup Co., supra, \6 N.J.Tax at 224 (holding that when a timely Complaint is filed in this Court challenging the judgment of a county board of taxation a counterclaim may be filed within 35 days after service of the Complaint pursuant to R. 8:4-3 and R. 4:6-1).

 The Appellate Division holding in Rek Inv. Co. v. City of Newark, 80 N.J.Super. 552, 557, 194 A.2d 368 (1963), that a judgment of a county board of taxation, while entitled to a presumption of correctness, "does not attain the status of a ‘floor’ or ‘ceiling’ beyond which the assessment cannot be fixed" on appeal to the Tax Court in the absence of a counterclaim by the municipality is not controlling here. In Rek Inv. Co, the taxpayer successfully challenged an assessment before the county board, gaining a reduction. Id. at 555, 194 A.2d 368. The taxpayer thereafter filed an appeal in the Division of Tax Appeals seeking a further reduction in the assessment. The municipality did not file a counterclaim. Ibid. After trial, the Division determined that the value of the property was, after adjustment for the common level ratio, lower than the original assessment, but *187 higher than the reduced assessment of the county board. Ibid. The court allowed the Division to enter judgment for an amount higher than the judgment of the county board notwithstanding the lack of a municipal cross-appeal "where such action was necessary to bring the assessment to equalized true value." Id. at 558, 194 A.2d 368. Although not expressly mentioned in the Rek Inv. Co. opinion, it is clear that the tax year at issue in that matter was not a revaluation year. The holding in Rek Inv. Co. is effectively incorporated in Chapter 123, which allows for an increase in an original assessment, regardless of the municipality’s failure to file a counterclaim, when necessary to bring the assessment within the common level range. The decision does not address whether an assessment may be increased above the amount set in a county board judgment in a revaluation year, where Chapter 123 is not applicable, if the municipality does not file a counterclaim in this court. That issue, which is one of apparent first impression, is decided in this opinion.