TAX COURT OF NEW JERSEY



Joshua D. Novin
Judge

Washington & Court Streets, 1st Floor
P.O. Box 910
Morristown, New Jersey 07963
Tel: (609) 815-2922, Ext. 54680
Fax: (973) 656-4305

NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS

September 20, 2019

Michael J. Donnelly, Esq.
Lasser Hochman, L.L.C.
75 Eisenhower Parkway, Suite 120
Roseland, New Jersey 07068-1694

Fred Semrau, Esq.
Dorsey & Semrau, LLC
714 Main Street
P.O. Box 228
Boonton, New Jersey 07005

> Re:   Braemar at West Milford, LLC v. West Milford Township
> Docket Nos. 012238-2010, 011850-2011, 010904-2012,
> 014484-2013, 011227-2014, 008652-2015, and 008236-2016

Dear Mr. Donnelly and Mr. Semrau:

This letter constitutes the court's opinion following trial in the above matters. Plaintiff, Braemar at West Milford, LLC ("Braemar"), challenges the 2010 through 2016 local property tax assessments on real property it owned in West Milford Township ("West Milford").

For the reasons stated more fully below, the court reduces, in part, and affirms, in part, the property's local property tax assessments.

## I.   Procedural History and Factual Findings

Braemar was the owner of a tract of real property located along Wooley Road in West Milford Township, Passaic County, New Jersey. The real property consisted of four contiguous lots containing a total of 76.63 acres. The property was identified on West Milford's municipal tax map as Block 10001, Lots 14, 19, 20, and 23 (the "subject property").

1

Braemar timely filed complaints challenging the subject property's 2010, 2011, 2012, 2013, 2014, 2015 and 2016 year local property tax assessments. The matters were tried to conclusion over several days.

During trial, Braemar offered testimony from its principal, its land use attorney, and a State of New Jersey certified general real estate appraiser. Braemar's principal, Ralph Loveys, Jr. ("Mr. Loveys"), offered credible testimony that he is a seasoned land developer and property manager in New Jersey, having worked in that capacity for approximately thirty-eight years. Mr. Loveys expressed that during his tenure, his firm has "constructed approximately twenty-five different projects in twenty different municipalities throughout the central and northern part of New Jersey. About 3,500 residential units, and a few hundred thousand square feet of commercial space, and we currently own and manage projects in about twelve different municipalities in the State." One of those projects included a thirty-two single-family home subdivision and development in West Milford, which was completed in approximately 2007.

Braemar and West Milford stipulated to Braemar's appraiser's qualifications as an expert in the field of property valuation. Based on the expert's knowledge, skill, licensure as a State of New Jersey certified general real estate appraiser, and more than twenty-five years of experience as an appraiser, the court accepted him as an expert in the field of property valuation (the "expert"). The expert prepared an appraisal report expressing an opinion of market value for the subject property as of the October 1, 2009, October 1, 2010, October 1, 2011, October 1, 2012, October 1, 2013, October 1, 2014, and October 1, 2015 valuation dates.

West Milford offered testimony only from its municipal tax assessor and from its Planning Board attorney.

2

As of each valuation date, the tax assessment, implied equalized value, and the expert's value conclusion for Lots 14, 20 and 23 are set forth below:

| Valuation date | Total tax assessments Lots 14, 20 & 23 | Avg. ratio of assessed to true value | Total implied equalized value Lots 14, 20 & 23 | Expert's value conclusion Lots 14, 20 & 23 |
|---|---|---|---|---|
| 10/1/2009 | $460,200 | 40.77% | $1,128,771 | $425,000 |
| 10/1/2010 | $460,200 | 43.48% | $1,058,418 | $425,000 |
| 10/1/2011 | $1,056,800 | 100% | $1,056,800 | $425,000 |
| 10/1/2012 | $1,056,800 | 89.90% | $1,175,528 | $425,000 |
| 10/1/2013 | $1,056,800 | 92.92% | $1,137,322 | $425,000 |
| 10/1/2014 | $1,056,800 | 95.27% | $1,109,268 | $425,000 |
| 10/1/2015 | $1,056,800 | 90.34% | $1,169,803 | $425,000 |

As of each valuation date, the tax assessment, implied equalized value, and the expert's value conclusion for Lot 19 is set forth below:

| Valuation date | Tax assessment Lot 19 | Avg. ratio of assessed to true value | Implied equalized value Lot 19 | Expert's value conclusion Lot 19 |
|---|---|---|---|---|
| 10/1/2009 | $343,100 | 40.77% | $841,550 | $431,000 |
| 10/1/2010 | $343,100 | 43.48% | $789,098 | $425,000 |
| 10/1/2011 | $628,200 | 100% | $628,200 | $420,000 |
| 10/1/2012 | $628,200 | 89.90% | $698,776 | $410,000 |
| 10/1/2013 | $628,200 | 92.92% | $676,065 | $410,000 |
| 10/1/2014 | $628,200 | 95.27% | $659,389 | $400,000 |
| 10/1/2015 | $628,200 | 90.34% | $695,373 | $400,000 |

During trial evidence was offered that on or about June 25, 2003, the West Milford Planning Board (the "Planning Board") granted preliminary major subdivision approval for construction of a seventeen lot single-family subdivision development on the subject property.[1] The Planning Board's grant of preliminary major subdivision approval was conditioned on the applicant: (i) "hav[ing] received approval from NJDEP of all wetland permits concerning this application. . ."; (ii) "hav[ing] filed with the Health Department for the necessary permits to drill

---

[1] Preliminary major subdivision approval was granted to the subject property's former owner Kerry Greene.

five (5) individual residential wells for five (5) of the proposed lots. . .”; (iii) “provid[ing] notice to the Planning Department of the start time and date of the pump test”; (iv) “hav[ing] drilled the five (5) wells and received any approvals necessary to conduct a twenty-four hour continuous well pump test of one of the five wells while continuously monitoring the other four (4) wells. . .”; (v) “submit[ting] the results certified by a professional hydrogeologist of this testing to the Township Health Department and Planning Department”; and (vi) “[p]rior to any building permits being issued for the construction of houses, the individual well or wells are to be drilled and tested for a constant rate of two-gallons per minute (minimum) for a minimum of four (4) hours continuous pumping.”[2]

Following preliminary major subdivision approval, the former owner began certain site improvement work and engaged a firm to prepare an aquifer test plan for the subject property.

On or about August 10, 2004, New Jersey enacted the Highlands Water Protection and Planning Act, N.J.S.A. 13:20-1 to -35 (the “Highlands Act”). The Highlands Act provides an apparatus for regional land use planning in areas of northern New Jersey identified as the Highlands Region. See N.J.S.A. 13:20-7(a). The Highlands Region consists of portions of Bergen, Hunterdon, Morris, Passaic, Somerset, Sussex, and Warren counties. Ibid. The subject property is entirely located in the Highlands Region. See N.J.S.A. 13:20-7(b).[3]

However, the Highlands Act includes a number of “exemptions from its regulatory provisions, including one for any major Highlands development project that received one of a

---

[2] Preliminary major subdivision approval included the dedication and filing of a conservation easement containing approximately 51.634 acres for open space.

[3] The Highlands Region was deemed by our Legislature as an area “of exceptional natural resource value . . . includ[ing] watershed protection and . . . [as] environmentally sensitive lands where stringent protection policies should be implemented.” 2004 N.J. ALS 120.

4

specified list of municipal land use approvals" under the Municipal Land Use Law, N.J.S.A. 40:55D-1 to -163 (the "MLUL"). Lakeside Manor v. State Dept. of Environmental Protection, 421 N.J. Super. 362, 364 (App. Div. 2011); See N.J.S.A. 13:20-28. The Highlands Act defines, in part, a "major Highlands development [as one] that received on or before March 29, 2004 . . . preliminary or final site plan approval . . ." and certain designated permits from the Department of Environmental Protection. N.J.S.A. 13:20-28(a)(3).

Following enactment of the Highland's Act, the subject property's former owner applied for an exemption under the Highland's Act. On or about December 20, 2004, the New Jersey Department of Environmental Protection (the "NJDEP") issued a letter advising that the development activities on the subject property are "deemed exempt from the provisions of the Highlands Water Protection and Planning Act" (the "December 20, 2004 exemption letter"). However, the subject property's Highland's Act exemption was subject to certain limitations. Specifically, the NJDEP's December 20, 2004 exemption letter provided that the subject property's Highlands Act exemption "shall expire if there is a cumulative lapse in construction of more than one year after August 10, 2007."

On or about March 4, 2004, a proposed aquifer test plan was submitted to the Planning Board and approved in or about September 2004. Testing and monitoring of five wells on the subject property were then completed and the results memorialized in a November 18, 2005 letter report forwarded to the Planning Board.

In 2006, Braemar formerly acquired the subject property for consideration of $2,600,000. On or about March 27, 2006, Braemar filed its application seeking final major subdivision approval. However, by letter dated May 4, 2006, the Planning Board deemed Braemar's

application for final major subdivision approval incomplete and requested additional documentation.

Thereafter, Braemar attempted to satisfy the outstanding conditions of the final major subdivision approval application and continued site improvement work on the subject property. In late 2006, Braemar submitted applications for construction permits to build a single-family home on Lot 19, and to build a single-family model home on one of the proposed interior building lots.[4] Braemar received the construction permits and began construction of the two single-family homes.

By letter dated February 12, 2007, after reviewing the results from Braemar's aquifer test and subsequent correspondence, the Planning Board's hydrogeologist expressed "concerns" that Braemar's well test was "not sufficiently complete to demonstrate the viability of developing 16 new wells, or to predict the full impact on the performance of existing wells at surrounding homes." The Planning Board's hydrogeologist recommended Braemar "develop a comprehensive conceptual model to better explain the behavior of this complex [aquifer] system." The letter further made a series of recommendations regarding the drilling of the remaining new wells and how to measure their potential impact on neighboring wells.

On or about May 22, 2007, Braemar's hydrogeologist issued a response to the Planning Board's hydrogeologists "concerns." The response acknowledged that the test results were "somewhat unusual," however concluded that the groundwater recharge for the subject property was more than what is required to support the proposed sixteen private wells.

On or about November 7, 2007, the West Milford Township Council adopted an amendment to its water supply ordinance. Codified as §470-215.1, the Water Supply and Water

---

[4] Although Braemar applied for and received a construction permit to build a single-family model home on one of the proposed interior lots, it understood that the model home could not be conveyed without receipt of final major subdivision approval.

Quality Requirement Ordinance No. 2007-028 (the "Water Supply Ordinance"), was enacted to ensure that residential developments "any time consist[ing] of four or more new lots . . . that will result in total groundwater withdrawals greater than 800 gallons per day . . . demonstrate that adequate water supply is available for the . . . proposed use(s) . . . without adverse impacts on neighboring wells and other resources. . . ."

Braemar initially adopted the position that the Water Supply Ordinance was not applicable to the subject property's subdivision development because preliminary major subdivision approval was obtained prior to enactment of the ordinance.[5]

With the well-documented economic downturn that began in late 2007, plunging the United States into one of the worst recessions that it had experienced in decades, Braemar's efforts to perfect final major subdivision approval for the subject property dramatically slowed. However, investigations, reports, and communications regarding the Water Supply Ordinance, the subject property's aquifer test, aquifer test plan addendum, and available groundwater continued to be exchanged, and construction of the single-family home on Lot 19 continued.[6]

In or about 2008, construction of the single-family home on Lot 19 was substantially complete. However, conflicting testimony was offered during trial with respect to when Braemar

[5] Braemar's position regarding the applicability of the Water Supply Ordinance subsequently changed. By letter dated October 14, 2010, Braemar's counsel advised the Planning Board that Braemar intended to comply with the Water Supply Ordinance.

[6] In or about 2008, Braemar's construction lender advised it that due to general economic conditions, a freeze was being placed on its revolving construction loan. Thus, although construction of the single-family model home on the interior building lot was approximately two-thirds complete, Braemar ceased construction of the model home. Testimony was introduced during trial that the model home was subsequently vandalized.

made application to West Milford for a certificate of occupancy for the single-family home on Lot 19.[7]

Commencing in October 2010 and continuing into 2011, Braemar exchanged communications with the Planning Board with respect to its continuing efforts to address the Planning Board's May 4, 2006 notice of incompleteness, and Braemar's application for final major subdivision approval. In response, the Planning Board issued Braemar several additional notices of incompleteness on November 10, 2010, March 21, 2011 and June 29, 2011. The communications included, but were not limited to, correspondence, reports, proposed aquifer test plan, addendums to the proposed aquifer test plan, and review of the proposed aquifer test plan.[8]

By letter dated May 12, 2011, the Planning Board's counsel contacted the NJDEP. In his letter, he requested that the NJDEP "determine whether the Highland's [Act] exemption for this project has expired," under the December 20, 2004 exemption letter. Specifically, the Planning Board's counsel cited to those provisions of the December 20, 2004 exemption letter which stated that "the exemption would expire if there were a 'cumulative lapse in construction of more than one year after August 10, 2007.'"

On June 27, 2011, the NJDEP issued a response to the Planning Board's counsel (the "June 27, 2011 determination letter"). The June 27, 2011 determination letter stated that Highland's Act "exemption was issued because of the [grant of preliminary major subdivision approval and a

---

[7] A certificate of occupancy for the single-family home on Lot 19 was issued by West Milford in 2012. Braemar's land use attorney offered testimony that the subdivision approval did not require any changes to Lot 19. However, this testimony contradicted Mr. Loveys testimony that approximately 3 acres of Lot 19 were required to be set aside in order to obtain final major subdivision approval.

[8] The Planning Board's hydrogeologist at that time concluded that Braemar's aquifer test report dated November 18, 2005 failed to satisfy the requirements of the Water Supply Ordinance.

8

Freshwater Wetlands permit] . . . , and expires when any one of those approvals expire." The NJDEP concluded that "the Freshwater Wetlands general permit has expired [and] the [Highlands Applicability Determination] issued on December 20, 2004, has also expired and the project is no longer exempt."[9]

By letter dated June 29, 2011, the Planning Board issued a fourth Notice of Incompleteness to Braemar advising that it received the NJDEP's June 27, 2011 determination letter, and that Braemar's "application 'must be deemed incomplete, since the residential construction contemplated by this application is not feasible without a Highlands exemption or approval.'" The Planning Board's letter further advised that "[g]iven the prolonged history of this final major subdivision application . . . the Applicant should be advised that this determination of incompleteness closes the current application" for final major subdivision approval.

Apparently, because Braemar challenged the Planning Board's decision to close its application for final major subdivision approval, the Planning Board scheduled a completeness hearing. Following the completeness hearing, the Planning Board concluded that Braemar's application for final major subdivision approval was incomplete as a result of its noncompliance with the Water Supply Ordinance and lack of a valid Highland's Act exemption. Therefore, the Planning Board terminated its review of Braemar's application for final major subdivision approval.

On or about December 12, 2011, Braemar commenced litigation against West Milford and the Planning Board seeking declaratory judgment that approval of its application for final major subdivision approval does not require compliance with the Water Supply Ordinance, and a writ of

---

[9] Braemar disputed the findings contained in the NJDEP's June 27, 2011 determination letter and pursued an administrative appeal.

mandamus compelling the Planning Board to consider its application for final major subdivision approval. In addition, as part of the relief being sought, Braemar demanded issuance of a certificate of occupancy for the single-family home constructed on Lot 19.

On or about September 24, 2012, Braemar, West Milford and the Planning Board entered into a Settlement Agreement and Consent Order (the "Settlement Agreement"). Pursuant to the Settlement Agreement: (a) the Planning Board agreed to reinstate Braemar's application for final major subdivision approval; (b) Braemar agreed that its compliance with the Water Supply Ordinance was a prerequisite to receipt of unconditional approval of its application for final major subdivision approval and the final plat for filing; and (c) if Braemar's application for final major subdivision approval met all requirements, except those related to the Water Supply Ordinance, the Planning Board will grant a conditional approval of the final major subdivision subject to: (i) compliance with the Water Supply Ordinance; and (ii) Braemar submitting satisfactory evidence that the December 20, 2004 Highland's Act exemption letter remains effective or has been reinstated by the NJDEP.

On October 25, 2012, the Planning Board granted conditional approval of Braemar's final major subdivision application. The conditions included, but were not necessarily limited to, compliance with the Water Supply Ordinance, Braemar submitting satisfactory evidence that the December 20, 2004 Highlands Act exemption letter remains effective or was reinstated by the NJDEP, and the final major subdivision plat will not be released until all conditions have been fulfilled.

On December 20, 2012, the NJDEP issued a letter, based on its review of additional information submitted by Braemar, finding that "the work conducted under the Freshwater Wetlands General Permits . . . was completed prior to both permit expiration dates, and that the

local approval remains valid." (emphasis added). Thus, "the Exempt – Consistent finding from [the] December 20, 2004 [exemption letter] remains valid."

Additional testing and analysis of the subject property's aquifer was then performed. Reports were issued by Braemar's hydrogeologist and were reviewed and commented upon by the Planning Board's hydrogeologist.

On September 3, 2015, a hearing was conducted by the Planning Board to determine whether Braemar satisfied the conditions precedent to final major subdivision approval, specifically as it related to the Water Supply Ordinance. Following the presentation of testimony, the Planning Board found that "[o]f the ten (10) wells installed . . . none were able to sustain the minimum pumping rate of 5.7 gallons per minute (gpm), corresponding to the peak-day demand, for a 24-hour period." Thus, the Planning Board concluded that Braemar did not satisfy the well recovery or property boundary drawdown criteria under the Water Supply Ordinance, which were conditions precedent to the grant of final major subdivision approval, and required Braemar to "review and adjust the proposed demands and/or extent of the proposed development."

On or about December 4, 2015, Braemar submitted a revised proposed final major subdivision plat plan providing for the construction of a twelve lot single-family subdivision on the subject property, instead of the previous seventeen lot single-family subdivision.

On December 17, 2015, the Planning Board conducted a hearing on Braemar's proposed twelve lot single-family subdivision. Following the hearing, the Planning Board concluded that the revised plat, along with restrictions imposed on demand and usage, "constitute substantial compliance with the requirements" of the Water Supply Ordinance. Accordingly, the Planning Board approved Braemar's revised final major subdivision plat plan for twelve single-family home building lots. However, the aforesaid final approval was conditioned upon the testing of three

11

newly installed wells which had not previously been tested.  The approval condition stated that "[i]f the results of the [well water] tests do not satisfy the criteria set forth in the . . . test procedures, as determined by the [Planning] Board's hydrogeologist, the corresponding lot or lots are to be merged with adjoining lots and a revised final subdivision plat in accordance with such merger(s) shall be filed."

On or about August 25, 2016, Braemer sold the single-family home constructed on Lot 19 for $425,000.[10] [11]

## II.  Conclusions of Law

### A.  Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity."  MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998).  "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous."  Pantasote Co. v. Passaic City, 100 N.J. 408, 413 (1985) (citing Riverview Gardens v. North Arlington Borough, 9 N.J. 167, 174 (1952)).  "The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced."  Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998).  A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value.  That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption."  Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952).  Thus, at the close of the proofs, the

---

[10]  The sale apparently required the purchaser to relinquish approximately three acres of the real property in order for Braemar to submit the final subdivision plat for recording.

[11]  After efforts to sell the remaining eleven single-family building lots apparently failed, in or about November 2016, Braemar sold, at auction, the remaining eleven single-family building lots for a total consideration of $71,500.

court must be presented with evidence that raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

In evaluating whether the evidence presented meets the "cogent evidence" standard, the court "must accept such evidence as true and accord the [challenging party] all legitimate inferences which can be deduced from the evidence." Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520 (1995)). The evidence presented, when viewed under the Brill standard "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. City of East Orange, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Properties, Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000)). "Only after the presumption is overcome with sufficient evidence . . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. City of Summit, 188 N.J. Super. 34, 38-39 (App. Div. 1982)).

Here, at the close of Braemar's proofs, West Milford moved to dismiss these matters under R. 4:37-2(b), arguing that Braemar failed to overcome the presumption of validity that attaches to the local property tax assessments.[12] According Braemar all reasonable and legitimate inferences which could be deduced from the evidence presented, the court concluded that Braemar produced cogent evidence sufficient to overcome the presumption of validity. If accepted as true, the opinions of Braemar's expert and the facts upon which Braemar's expert relied raised debatable questions regarding the correctness of the subject property's tax assessments for the 2010, 2011,

---

[12] West Milford also maintained that flaws existed in the expert's highest and best use analysis, comparable sales data and units of comparison, rendering the expert's report and testimony unreliable and a net opinion, thereby warranting dismissal.

2012, 2013, 2014, 2015, and 2016 years.  Accordingly, the court denied West Milford's motion to dismiss and placed a statement of reasons on the record.

However, concluding that the presumption of validity has been overcome does not equate to a finding that a tax assessment is erroneous.  Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Edison Twp., 127 N.J. 290, 312 (1992).  The court must be mindful that "although there may have been enough evidence [presented] to overcome the presumption of correctness at the close of [the challenging party's] case-in-chief, the burden of proof remain[s] on the [challenging party] . . . to demonstrate that the judgment [or local property tax assessment] under review was incorrect." Id. at 314-15.

### B.  Highest and Best Use

"For local property tax assessment purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000).  Therefore, the starting point of the court's journey to discern a property's true value focuses on the highest and best use analysis. See Ford Motor Co., 10 N.J. Tax at 161 (concluding that the highest and best use analysis is "the first and most important step in the valuation process.").  The phrase highest and best use has been defined as:

> The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value. . . Alternatively, the probable use of land or improved property – specific with respect to the user and timing of the use – that is adequately supported and results in the highest present value.
>
> [Appraisal Institute, The Dictionary of Real Estate Appraisal, 93 (5th ed. 2010) (emphasis added).]

14

Thus, the highest and best use analysis comprises the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive." Clemente v. South Hackensack Twp., 27 N.J. Tax 255, 267-269 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015). See also County of Monmouth v. Hilton, 334 N.J. Super. 582, 588 (App. Div. 2000).

However, highest and best use is not a static principle, rather it is shaped and impacted by market forces. A property's highest and best use may alter over time based on economic changes, a market that is in transition, from underdevelopment or overdevelopment, or as a result of zoning changes. The highest and best use of a property "is not determined through subjective analysis by the property owner, the developer, or the appraiser; rather, highest and best use is shaped by the competitive forces within the market where the property is located. Therefore, the analysis and interpretation of highest and best use is an economic study of market forces focused on the subject property." Entenmann's Inc., 18 N.J. Tax at 545 (citing Appraisal Institute, The Appraisal of Real Estate 298 (11th ed. 1996)).

West Milford asserted that the expert's conclusion that final major subdivision approval was "speculative," is not supported in the record and by a thorough evaluation and review of the Planning Board resolutions, correspondence, and related documents. Moreover, West Milford argued that the expert's highest and best use analysis was fatally flawed because he failed to account for all financially feasible and maximally productive uses of the subject property. Additionally, West Milford maintained that other legally permitted uses on the subject property may have been more financially feasible and maximally productive.[13] Finally, West Milford

---

[13] When a party maintains that a property's highest and best use should be other than its current proposed use, it is incumbent upon that party to establish that proposition by a fair preponderance of the evidence. Penns Grove Gardens, Ltd v. Borough of Penns Grove, 18 N.J. Tax 253, 263

contended that the expert's legally permissible, physically possible, financially feasible, and maximally productive conclusions were not supported by adequate factual data and analysis and thus, amounted to a net opinion.[14]

Evidence of a property's highest and best use must be offered by qualified expert testimony.  Like all other expert opinion testimony, it must be rendered by an individual who is qualified "by knowledge, skill, experience, training, or education" to offer a "scientific, technical, or . . . specialized" opinion that will assist the trier of fact "to understand the evidence or to determine a fact in issue[.]"  N.J.R.E. 702.  Importantly, the expert's opinion must be based on facts or data "reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."  N.J.R.E. 703.  An expert's opinion must have objective support and the opinion may not be based on a standard that is personal.  Pomerantz Paper Corp. v. New Comm. Corp., 207 N.J. 344, 373 (2011).  The expert must "'give the why and wherefore' of his or her opinion, rather than a mere conclusion."  Rosenberg v. Tavorath, 352 N.J. Super. 385, 401 (App. Div. 2002) (quoting Jimenez v. GNOC, Corp., 286 N.J. Super. 533, 540 (App. Div.), certif. denied, 145 N.J. 374 (1996)).  In sum, an expert's highest and best use conclusion must be rooted in facts and supported by a proper market analysis, and not be speculative or conjectural.

Here, West Milford and Braemar stipulated to the expert's qualifications, and the court accepted him as an expert in the field of property valuation.  The expert offered credible testimony that in preparing his appraisal report, including performing his highest and best use analysis, he

---

(Tax 1999); Ford Motor Corp., 10 N.J. Tax at 167.  Here, West Milford offered no testimony from an appraiser regarding the highest and best use of the subject property.

[14]  Specifically, West Milford contended that because the expert's highest and best use analysis did not analyze the market or financial feasibility of each legally permitted use in the R-3 and R-4 zoning districts, it amounted to a net opinion.

16

inspected the subject property, consulted with representatives of Braemar, and Braemar's land use attorney with respect to the subject property's preliminary major subdivision approval and final major subdivision approval process. He reviewed the Planning Board's resolutions, communications between Braemar and the Planning Board, the declaratory judgment complaint and its exhibits, and documents related to the subject property's Major Subdivision Approval, including without limitation, costs expended by Braemar during the Major Subdivision Approval, the hydrogeological reports and aquifer testing reports. The expert further credibly testified that he reviewed the "land use regulations that were important to the subject site that included zoning, what zone were the properties located in, what were the permitted uses in those zones, what was the minimum lot size, the density of development maximums permitted on the zone, the setbacks, the rear yard setbacks, the building envelope, dimensions and building coverage ratios . . . [and] any steep slope restrictions on the subject property that might impact location of build sites. . . ." He also testified that he examined the marketplace and both micro- and macro-economic factors affecting West Milford including, without limitation, demographics, housing prices, and supply and demand factors. Thus, the court is satisfied that the expert was qualified to offer opinion testimony with respect to the subject property, including its highest and best use.

Under a highest and best use analysis, although the legally permissible and physically possible criteria can be considered in either order, they must be applied before consideration is given to the financially feasible and maximally productive criteria. Our court has emphasized that:

> Tests of legal permissibility and physical possibility <u>must</u> be applied before the remaining tests of financial feasibility and maximal productivity. A use may be financially feasible, but this is irrelevant if it is physically impossible or legally prohibited. Only when there is a reasonable possibility that one of the prior, unacceptable conditions can be changed is it appropriate to proceed with the analysis.

17

> [Mori v. Town of Secaucus, 15 N.J. Tax 607, 619 (Tax 1996), rev'd on other grounds, 17 N.J. Tax 96 (App. Div. 1997) (quoting Appraisal Institute, The Appraisal of Real Estate, 280 (10th ed. 1992)) (emphasis in original).]

See also County of Monmouth v. Hilton, 334 N.J. Super. 582, 588 (App. Div. 2000); Schimpf v. Little Egg Harbor Twp., 14 N.J. Tax 338, 344 (Tax 1994). See also Appraisal Institute, Appraisal of Real Estate, 335 (14th ed. 2013) (concluding that "[i]n practice, the tests of physical possibility and legal permissibility can be applied in either order, but they must be applied before the tests of financial feasibility and maximum productivity.")

In addressing the legally permissible test, the expert observed, as of each valuation date involved herein, that the subject property legally consisted of four tax lots located in the R-3 Low Density Residential, and the R-4 Very Low Density Residential zoning districts (Lots 14, 19, 20 & 23) with permissible uses that included: farms, single-family detached dwelling units, residential cluster developments, public utilities, community residences for the disabled, equestrian centers, shooting ranges (R-4 district only), bed and breakfasts, and wireless telecommunication facilities. Based on his review of the zoning information, the expert concluded that the most probable, legally permitted use of the land would be for construction of single-family homes.[15]

Significantly however, the expert expressed that, "whether those [major subdivision] approvals were ever really in effect or could be completed to final [approval] remains uncertain until about 2016." In his opinion, it was "unclear from the planning board minutes and from the documentation . . . how many lots would be legally permissible at the subject property beyond [the] four lots [that] existed in the current tax configuration." Therefore, according to the expert,

---

[15] The expert did not employ the subdivision or anticipated use method in valuing the subject property. See Alpine Country Club v. Borough of Demarest, 354 N.J. Super. 387, 391 (2002 App. Div.); see also Tamburelli Poperties Ass'n v. Cresskill, 15 N.J. Tax 629 (Tax 1996), aff'd, 308 N.J. Super. 326 (App. Div. 1998); Genola Ventures-Shrewsbury, 2 N.J. Tax at 546-7.

"given the planning board minutes, the record, and the actions of the [West Milford] Township to have the [NJ]DEP withdraw their Highlands [Act] exemption, the property did not have development potential beyond four lots on any of the dates of valuation" and that final major subdivision approval was "speculative." Notably, the expert further expressed that:

> the [subject] property had preliminary approval with conditions, those conditions were not met and deemed complete by the township for all of the years under appeal, a final plat map could not be filed . . . so there are only four lots under each year of appeal, the record is clear from the planning board that the hydrogeologist reports were being rejected throughout each year under the appeal, a building permit could not be issued under each year under appeal and . . . no certificates of occupancy issued, so on each date there was nothing more than four lots, and because of the uncertainty with the water quality ordinance and the project's compliance with that water quality ordinance, suggesting that seventeen lots or twelve lots or any number of lots above the four tax lots . . . would be speculative to assume a certain number of lots . . . The whole issue of the potable water supply is still unclear because three lots require further testing . . . And finally, the project didn't even have a Highland's [Act] exemption for two years due to actions by the West Milford Planning Board, so regardless of whether they met the water quality standards or not, it had no development potential as a project for those two years that the Highland's [Act] exemption was withdrawn.

Under the financial feasibility test, the expert opined that "on each date of valuation there was a road in place, there were storm sewer[s], utility lines in place and there was the infrastructure for a project in place. What was left was constructing homes and would the construction costs exceed what could be gained in the marketplace in terms of sale price. It looked like the project having all this infrastructure in place was financially feasible . . . the four lots could be used to support a house and produce some sort of financial gain to a developer." However, the expert readily acknowledged that without the partially completed Virginia Lane, Lots 14 and 20 would be landlocked. Therefore, his opinion regarding the financial feasibility of constructing single-family homes on those lots was premised on the partially completed roadway "receiv[ing] the

19

variance necessary to service the lots [14 and 20] since it was already in place . . . There would need to be some sort of variance application made for that, I assumed that they would be able to get that since the infrastructure was in place already. That I thought was reasonably probable and not speculative."

Finally, in the expert's opinion the maximally productive use of the subject property "would be [a] residential development consistent with zoning on the four tax lots." In the expert's opinion, "[n]o other legally permissible land use is capable of generating profits greater than single family home construction" on the four tax lot lots.

In sum, the expert concluded that subdivision development approvals were not reasonably probable as of each valuation date involved herein. Therefore, in the expert's opinion, the subject property should be valued as four individual lots having a highest and best use as follows: (a) Lot 19, as improved with a single-family home; (b) Lot 14, as a single-family home building lot; (c) Lot 20, for completion of the single-family model home partially constructed on the lot; and (d) Lot 23, as a single-family home building lot.

A fundamental tenet of the highest and best use analysis is that property, regardless of its character, must be valued and assessed for local property tax purposes in the condition in which it is utilized on the assessing date and "the burden is on the person claiming otherwise to establish differently." Highview Estates v. Borough of Englewood Cliffs, 6 N.J. Tax 194, 200 (Tax 1983); N.J.S.A. 54:4-23. See Trustees of Stevens Institute of Technology v. State Bd. of Taxes & Assessment, 105 N.J.L. 99, 101 (Sup. Ct. 1928), aff'd, 105 N.J.L. 655 (E & A 1929) (concluding that "[p]roperty to be assessed, whatever may be its character, is to be taken and valued in the actual condition in which the owner holds it."). See also Berkeley Develop. Co. v. Berkeley Heights Twp., 2 N.J. Tax 438 (Tax 1981). The "proposed use must not be remote, speculative, or

20

conjectural. If a party seeks to demonstrate that a property's highest and best use is other than its current use, it is incumbent upon that party to establish that proposition by a fair preponderance of the evidence." Clemente, 27 N.J. Tax at 269 (citing Penns Grove Gardens, Ltd. v. Borough of Penns Grove, 18 N.J. Tax 253, 263 (Tax 1999); Ford Motor Corp., 10 N.J. Tax at 167); see also General Motors Corp. v. Linden City, 22 N.J. Tax 95, 149 (Tax 2005); Clemente, 27 N.J. Tax at 269; Acocella v. Cedar Grove Twp., 29 N.J. Tax 325, 336 (Tax 2016).

Moreover, in characterizing "a particular use as the property's highest and best use, the selected use in a value in exchange context must be a probable use for which there must be a demand in the relevant market." WCI-Westinghouse v. Edison Twp., 7 N.J. Tax 610, 616 (Tax 1985). In the highest and best use analysis, the examination of the broad spectrum of potential uses to which a property can be placed "cannot overlook the reality of the use for which the [property] was designed . . . and the actual condition" which the property owner has and continues to hold the property. Ford Motor Co., 10 N.J. Tax at 165.

Here, the subject property was located in West Milford's R-3 and R-4 zoning districts, with permitted uses that included low density and very low density single-family dwellings. In 2003, the subject property received preliminary major subdivision approval for seventeen single-family home building lots. In 2006 Braemar made application for final major subdivision approval for seventeen single-family home building lots. Although Braemar's application was deemed incomplete by the Planning Board, credible testimony was presented during trial that Braemar continued site work, including installation of retaining walls, well testing and efforts to comply with the conditions deemed incomplete by the Planning Board. Significantly, Braemar applied for, and received, two construction permits and commenced construction of two single-family homes on the subject property, completing one home in or around 2008 and being two-thirds

21

complete with construction of the other home in 2008. Thus, Braemar was utilizing the subject property for the development, construction and/or sale of single-family homes during each tax year at issue. In light of the above facts and based on the evidence and testimony adduced during trial, the court is satisfied that the expert's highest and best use conclusion was supported by adequate factual information, analysis, and investigation and therefore, did not constitute a net opinion.

However, it is well-settled that "the trial judge as the fact finder is not bound by the opinion valuation of the experts on either side. Just as a jury, a judge may adopt 'so much of it as appears sound, reject all of it, or adopt all of it.'" Riorano, Inc. v. Weymouth Twp., 4 N.J. Tax 550, 564 (Tax 1982) (quoting State Highway Com. v. Dover, 109 N.J.L. 303, 307 (E. & A. 1932)), aff'd, 6 N.J. Tax 253 (App. Div. 1983).

Adorning its fact finding cap, the court parts ways with the expert with his conclusion that final major subdivision approval was "speculative" and that the highest and best use of the subject property should be limited to four single-family home building lots as of each valuation date involved herein. In the court's pursuit to determine a property's market value, consideration must be given to that price which a hypothetical buyer would pay a hypothetical seller, neither of which are constrained to purchase or sell the property, as of October 1st of the pretax year. See New Brunswick v. State Div. of Tax Appeals, 39 N.J. 537, 543 (1963); Petrizzo v. Edgewater Borough, 2 N.J. Tax 197, 200 (Tax 1981); Genola Ventures v. Shrewsbury Borough, 2 N.J. Tax 541, 551 (Tax 1981). In performing the test of legal permissibility for vacant land, an appraiser must consider not only the legally permitted uses of a property, but the zoning laws, private restrictions, environmental laws and regulations, and sometimes, building codes and ordinances. Ford Motor Co., 10 N.J. Tax at 165. Part of that analysis requires consideration of the most "probable use of land or improved property," The Dictionary of Real Estate Appraisal, at 93, and the "reasonable

22

probability of future site plan approval when determining fair market value. . . ."  Borough of Saddle River v. 66 East Allendale, LLC, 216 N.J. 115, 139 (2013).  In this case, that required the expert to evaluate, in an objective manner, economic conditions, demand in the marketplace, the facts and information known to Braemar and its professionals, and to weigh that knowledge and information against the preliminary major subdivision approval conditions, including other extrinsic evidence, to discern whether final major subdivision approval and approval for what number of single-family home building lots were reasonably probable as of each valuation date.

Based on the testimony adduced during trial, in 2006, believing that it satisfied or substantially satisfied all of the conditions of the preliminary major subdivision approval, Braemar made application to the Planning Board for final major subdivision approval.  Although Braemar's application for final major subdivision approval was deemed incomplete by the Planning Board, Braemar nevertheless continued to proceed with the project by continuing to perform site work, securing construction permits and beginning construction of two single-family homes on the subject property.[16]  Despite the economic downturn that occurred in late 2007, Mr. Loveys credibly testified that Braemar continued site work and construction of the single-family home on Lot 19, with the intention of selling it and reserving three acres of Lot 19's land for Braemar to effectuate the seventeen lot subdivision.[17]  In the court's view, had Braemar reasonably believed during construction of the single-family home on Lot 19 that securing final major subdivision approval for seventeen single-family home building lots was not reasonably probable and attainable then it would not have been concerned with the preservation of the three acres of land associated with Lot

---

[16]  One single-family home was being constructed on Lot 19 and the other was being constructed on proposed building lot 16.

[17]  It is unclear from the record whether the three acres of Lot 19 were required as part of the Conservation Easement, or were required for other subdivision purposes.

19 needed to perfect final major subdivision. Rather, if it reasonably believed that only four single-family home building lots could be extracted from the subject property, its focus would have turned to attempting to secure variance approval for the partially completed roadway to afford access to the two landlocked parcels, Lots 14 and 20, in order to construct single-family homes thereon. However, based on testimony adduced during trial, despite the economic downturn, Braemar continued pursuit of its application for final major subdivision approval for seventeen single-family home building lots and attempted to satisfy the incomplete conditions of its final major subdivision approval application. The testimony offered from both Braemar's land use attorney and Mr. Loveys detailed the efforts undertaken by Braemar to secure final subdivision approval and its diligence in those efforts, including, without limitation, instituting litigation against the Planning Board to reopen its application for final major subdivision approval. Further, testimony was elicited that in 2010 Braemar acceded to the Planning Board's demands, and agreed to comply with the Water Supply Ordinance for the seventeen lots, demonstrating that it reasonably believed final major subdivision approval for seventeen single-family home building lots was attainable.

Moreover, based on Mr. Loveys more than thirty-eight years of experience and expertise in real estate development, and the continuing efforts of Braemar to secure final major subdivision approval, as well as the testimony of Braemar's land use attorney, the court finds it probable that Braemar reasonably believed final major subdivision approval could be achieved. Based on his level of sophistication in land development matters, the court finds that had Mr. Loveys reasonably believed, based on tests, information and discussions with his hydrogeological consultant and land use attorneys, that final major subdivision approval for seventeen single-family home building lots could not be achieved, he would not have expended the time and financial resources and pursued litigation against West Milford to secure those approvals. Instead,

had he reasonably believed final major subdivision approval for seventeen single-family home building lots could not be achieved, he would have altered those plans to consider other development opportunities for the subject property.

However, when the NJDEP issued its June 27, 2011 determination letter advising that the project was no longer exempt under the Highlands Act, developing the subject property into seventeen single-family home building lots appeared improbable and more problematic. According to Mr. Loveys, Braemar "knew the ramifications of [the loss of the Highland's Act exemption], it was very serious . . . ," "we could not have built the seventeen lot subdivision under the terms of the Highland's Act." Thus, without the Highland's Act exemption in place, major subdivision of the subject property into seventeen single-family home building lots would have been impossible, and development of the subject property into four single-family homes was the most reasonably probable highest and best use of the subject property.

It was only after litigation with the Planning Board was resolved with an agreement to reinstate Braemar's application for final major subdivision approval, and the NJDEP issued a reinstatement of the project's Highland's Act exemption on December 20, 2012, that development of the subject property into a seventeen single-family home subdivision again appeared reasonably probable.

Finally, it was not until approximately September 3, 2015, after the Planning Board concluded based on the hydrogeological reports and testimony that the wells drilled on the subject property did not meet the requirements of the Water Supply Ordinance and requested Braemar to "review and adjust the proposed demands and/or extent of the proposed development," that development of the subject property into twelve residential building lots appeared more reasonably probable.

25

Accordingly, based on the evidence presented, the court concludes that the highest and best use of the subject property was as follows: (i) Lot 19, as improved with a single-family home, as of the October 1, 2009, October 1, 2010, October 1, 2011, October 1, 2012, October 1, 2013, October 1, 2014, and October 1, 2015 valuation dates; and (ii) Lots 14, 20 and 23, as a proposed sixteen single-family home subdivision (seventeen lots less Lot 19), as of the October 1, 2009 and October 1, 2010 valuation dates; (iii) as three single-family home building lots as of the October 1, 2011 and October 1, 2012 valuation dates (four lots less Lot 19); (iv) as a proposed sixteen single-family home subdivision as of the October 1, 2013 and October 1, 2014 valuation dates (seventeen lots less Lot 19); (v) as a proposed eleven single-family home subdivision as of the October 1, 2015 valuation date (twelve lots less Lot 19).

C. Methodology

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. City of Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965)); ITT Continental Baking Co. v. East Brunswick Twp., 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001), certif. denied, 168 N.J. 291 (2001) (internal citation omitted)). The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of New York v. Neptune Twp., 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. Tax Appeals Div., 39 N.J. 537 (1963)).

26

Although the expert considered all three valuation methods, the expert opined that the sales comparison approach was the best method to derive an opinion of market value for Lots 14, 20, and 23, and Lot 19.

1. Sales Comparison Approach

The sales comparison approach is predicated upon an evaluation of market transactions involving the recent sale of similar properties. This approach involves a "comparative analysis of properties" and requires the appraiser to focus on the "similarities and differences that affect value . . . which may include variations in property rights, financing, terms, market conditions and physical characteristics." The Appraisal of Real Estate, at 378. "When data is available, this [approach] is the most straightforward and simple way to explain and support an opinion of market value." Greenblatt, 26 N.J. Tax at 53. The framework underlying the sales comparison approach is that "an opinion of the market value of a property can be supported by studying the market's reaction to comparable and competitive properties." The Appraisal of Real Estate, at 377. Thus, the efficacy and suitability of the sales comparison approach is dependent upon the sufficiency of the data on recent market transactions and the appraiser's detailed analysis of that data.

When engaging in a sales comparison approach, similarities must exist between the subject property and the comparable properties. "Evidence of comparable sales is effective in determining value only where there is a substantial similarity between the properties." Venino v. Carlstadt Borough, 1 N.J. Tax 172, 175 (Tax 1980), aff'd o.b., 4 N.J. Tax 528 (App. Div. 1981). However, comparability does not require properties to be identical, "differences between a comparable property and the subject property are anticipated. They are dealt with by adjustments recognizing and explaining these differences, and then relating the two properties to each other in a meaningful way so that an estimate of the value of one can be determined from the value of the other." U.S.

Life Realty Corp. v. Jackson Twp., 9 N.J. Tax 66, 72 (Tax 1987).  Thus, a fundamental predicate of the sales comparison approach requires that evidence "be based on 'sound theory and objective data,' rather than on mere wishful thinking."  MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376 (quoting FMC Corp. v. Unmack, 92 N.Y. 2d 179, 188 (1998)).  An appraiser must establish appropriate "elements of comparison for a given appraisal through market research and support those conclusions with market evidence."  The Appraisal of Real Estate, at 390.  Hence, the probative value of the sales comparison analysis hinges upon the similarities and differences which can be drawn, and the objective market data utilized to support adjustments thereto.

In the expert's opinion, the sales comparison approach was the most pragmatic method for deriving a value for the subject property because a market existed for: (i) improved single-family homes; (ii) vacant single-family home building lots; and (iii) residentially zoned vacant acreage without development approvals, and adequate sales data was available from each category from which he could discern an opinion of value.[18]

a.   Residentially zoned vacant acreage without development approvals

In performing his sales comparison approach of residentially zoned vacant acreage without development approvals, the expert focused on nine tracts of land that sold between January 2009 and August 2016.  All of the land tracts were located in West Milford and range in size from 11.91 acres to 127.68 acres.  The unadjusted sale prices range from $57,500 to $403,950, or $1,336 to $8,407 per acre.  The expert applied no adjustments to any of the sales.  In the expert's opinion,

---

[18]  The expert valued Lots 14, 20 & 23 by examining two sets of different land sale transactions: (i) vacant single-family dwelling lots; and (ii) sales of large vacant land tracts.  The expert then compared and reconciled the sales data.  According to the expert, "[i]ndividual lot sales provide a unit basis for determining what the site could be worth if approved for a predictable number of lots."  Conversely, the large vacant land tract "sales reflect the value of vacant, residentially zoned land without approvals."

the "acreage sales show no correlation with time," thus, no time and market condition adjustment was warranted. Additionally, in the expert's opinion the "data shows no correlation between price/acre and lot size," therefore, the expert applied no size adjustment. Finally, in the expert's opinion each of "the comparable tracts are heavily wooded with sloping terrain, wetlands and rock outcroppings . . . [thus,] given the high degree of similarity to the subject," no basis existed for a physical condition adjustment.

After reviewing the nine sales, the expert determined that the average price for vacant acreage without development approvals was $5,731 per acre, "with the largest cluster falling between $7,472/acre and $8,558/acre." Ultimately, the expert concluded a value of $5,000 per acre based on his analysis of the vacant acreage sales. The expert then applied his concluded $5,000 per acre value to the approximate 60.07 acres comprising Lots 14, 20, and 23 to determine an overall vacant acreage land value of $300,000. The expert then added the contributory value of the partially completed single-family model home, which he estimated at $125,000.[19] In total, the expert concluded a value of Lots 14, 20, and 23 of $425,000 ($300,000 + $125,000 = $425,000) as of each valuation date involved herein.

Effective cross-examination disclosed that none of the expert's nine residentially zoned vacant acreage sales had received a Highland's Act exemption like the subject property. Admittedly, the expert acknowledged that residentially zoned vacant acreage having a Highland's Act exemption would be inherently more valuable than other similarly sized properties not having a Highland's Act exemption, because of the potential for subdivision development. Significantly

---

[19] The expert offered credible testimony that Braemar's construction costs for the partially completed single-family model home amounted to $167,905. However, Braemar ceased construction on the model home causing it to deteriorate and to be vandalized therefore, he estimated the "deteriorated condition of the house" to be $125,000.

however, the expert made no upwards adjustment to any of the nine vacant acreage sales to account for the fact that none of them had received a Highland's Act exemption. In addition, although the subject property had received preliminary major subdivision approval in 2003 for a seventeen single-family home subdivision, none of the nine vacant acreage sales relied on by the expert had received any preliminary major subdivision approval. According to the expert, based on newspaper articles he reviewed, only two vacant acreage tracts in West Milford had obtained preliminary major subdivision approval prior to enactment of the Highlands Act and a Highland's Act exemption, the subject property and one other property that was not identified in his report.

Moreover, all nine comparable land sales identified by the expert were purchased and ultimately dedicated for preservation purposes, and no development of any kind was undertaken on those sites. In addition, according to the expert, all nine acreage sales constituted "buildable lots" despite the fact that they were all located in the Highland's Act preservation area. However, cross-examination disclosed that the expert did not know whether the Highland's Act set forth a minimum lot size requirement in order for it to be deemed "buildable," did not know what the minimum lot size requirement was under the Highland's Act, did not know whether the comparable sales satisfied the minimum lot size requirements and did not consult with any professional planner or West Milford planning or zoning official to determine whether any of the nine vacant land sales were in fact "buildable."

A critical element of the sales comparison approach is the appraiser's thorough research of the competitive marketplace for "information on properties that are similar to the subject property" and that have recently sold. The Appraisal of Real Estate, at 381. Here, although the expert identified vacant acreage sales in the West Milford marketplace, the properties that he identified were neither comparable, nor competitive in the marketplace with the subject property. None of

30

the properties identified by the expert had obtained final major subdivision approval, none of the properties had obtained a Highland's Act exemption, and none of the properties were ultimately developed for use as single-family homes. All of the nine vacant acreage sales identified by the expert were utilized for preservation purposes, and not for construction of single-family dwellings. Moreover, the expert failed to account for the differences that existed between the subject property and the nine comparable acreage sales by applying credible adjustments supported by objective market data.

For the foregoing reasons the court concludes that the expert's nine residentially zoned vacant acreage sales were not similar to, nor competitive in the marketplace with, the subject property, as of any valuation dates involved herein, and thus were not credible evidence of the subject property's true or market value.

b. Single-family home building lots

In performing his sales comparison approach of vacant single-family home building lots, the expert focused on five properties that sold between March 2011 and December 2016. According to the expert, all of the building lots "have vested rights for one single family dwelling [and] [t]herefore . . . reflect an approved value." All of the vacant single-family home building lots were located in West Milford and range in size from 2 acres to 5.3 acres, bearing a lot size "consistent with the lots proposed at the subject site." Accordingly, the expert applied no adjustments to any of the five comparable building lot sales and concluded a value of $40,000 per single-family home building lot.

However, because the subject property ultimately received final major subdivision approval for twelve single-family home building lots, with three of those lots requiring additional water testing, in the expert's opinion, the "net total" of foreseeable building lots was eight (12 − 3

– 1 (Lot 19) = 8). In sum, the expert did not ascribe any market value to the three single-family home building lots for which water tests were not performed as of the date final major subdivision approval was obtained. The expert then applied his concluded $40,000 per single-family building lot value to his "net total" of eight foreseeable single-family building lots to produce an estimated land value for Lots 14, 20, and 23 of $320,000 ($40,000 x 8 lots = $320,000).[20]

After considering and analyzing the evidence and testimony proffered by the expert with respect to the five vacant single-family home building lots, the court must reject the expert's value conclusion of $40,000 per single-family home building lot, as not being adequately supported by the record. Although the expert expressed his concluded value, he offered no testimony as to how he arrived at that value conclusion. Based on the court's review of the comparable sales, the unadjusted sale prices for the lots were $39,000 to $65,500, with a median sale price of $52,500. Thus, the expert's concluded value was $5,000 to $15,500 less, per building lot, than four of the comparable sales and approximately $12,500 less than the median sale price of the five comparable sales. Admittedly, the expert applied no adjustments to the comparable sales, and therefore the court is wholly uncertain how the expert arrived at his concluded value of $40,000 per building lot. Further, a review of the expert's appraisal report provides no insight into how he derived his concluded value per building lot. In sum, the expert offered little meaningful testimony or analysis as to how he derived his concluded value per building lot.

Accordingly, the court must conduct its own review and analysis of the five vacant single-family home building lots offered by the expert. Sale 1 was a 4.710 acre tract that sold on March

---

[20] Although the expert added the $125,000 contributory depreciated value of the partially constructed model home when computing his vacant acreage sales, he neglected to include the contributory value of the partially constructed model home when computing the value of the single-family home building lots.

30, 2011 for consideration of $56,000.[21]  Sale 2 was a 4.3 acre tract that sold on September 2, 2011 for consideration of $39,000.  Sale 3 was a 3.9 acre tract that sold on July 28, 2015 for consideration of $45,000.  Sale 4 was a 5.27 acre tract that sold on October 21, 2016 for consideration of $52,500.  Sale 5 was a 2 acre tract that sold on December 1, 2016 for consideration of $65,500.  Thus, the vacant single-family home building lots were all of a similar size to the proposed single-family home building lots on Lots 14, 20 and 23.  Additionally, all of the vacant single-family home building lots were located in West Milford within a few miles of the subject property.  Cross-examination reinforced that comparable sale 3 did not sell until July 28, 2015, and thus, is most meaningful to the October 1, 2015 valuation date involved herein.  Additionally, cross-examination further confirmed that comparable sales 4 and 5 occurred, respectively, twelve months and fourteen months following the latest valuation date involved herein, and thus were not ideal evidence of true value.  Ascribing the greatest degree of weight to comparable sale 1 ($56,000) and comparable sale 2 ($39,000), and the least weight to comparable sales 3, 4 and 5, the court concludes, based on the evidence presented, that a $50,000 value per single-family building lot, is more reasonable and supported by data and should be ascribed to the reasonably probable number of single-family home building lots on Lots 14, 20 and 23.

Additionally, the court finds credible and reasonable the expert's testimony that the depreciated contributory value of the partially constructed model home was $125,000.[22]  Therefore, the court concludes that Lots 14, 20, and 23 have an aggregate true or fair market value

---

[21]  Comparable sale 1 was not subsequently developed into a single-family home.  However, according to the expert, it was a single-family home building lot and a single-family home could have been constructed thereon.

[22]  The expert offered testimony during trial that the subdivided lot containing the partially constructed single-family model home was sold in 2017 for $180,000, inclusive of the land.

as follows: (i) as of the October 1, 2009 and October 1, 2010 valuation dates, $925,000 (16 lots x $50,000 = $800,000 + $125,000 = $925,000); (ii) as of the October 1, 2011 and October 1, 2012 valuation dates, $275,000 (3 lots x $50,000 = $150,000 + $125,000 = $275,000); (iii) as of the October 1, 2013 and October 1, 2014 valuation dates, $925,000 (16 lots x $50,000 = $800,000 + $125,000 = $925,000); and (iv) as of the October 1, 2015 valuation date, $675,000 (11 lots x $50,000 = $550,000 + $125,000 = $675,000).

      c.   Single-family home sales – Lot 19

In performing his sales comparison approach for Lot 19, the expert focused on ten single-family homes that sold between December 2008 and August 2016, including the sale of the single-family home on Lot 19, which sold on August 25, 2016.[23] All of the single-family homes were located in West Milford. The unadjusted sale prices ranged from $310,000 to $479,000, or $116 to $208 per square foot. The expert applied adjustments to the sales to account for perceived differences in: (i) time/market condition; (ii) location; and (iii) size. Because all of the comparable sales were constructed after 2000 and were located in West Milford, the expert made no adjustment

---

[23] West Milford objected to the court's consideration of the sale of the single-family home on Lot 19, as it occurred beyond the October 1, 2015 valuation date. It is well settled that "a bona fide sale of property may be indicative of the true value of the property . . . however, [it] is not dispositive on the issue of value." Glen Wall Associates v. Wall Twp., 99 N.J. 265, 282 (1985). It is for the trial court to weigh and appraise the factors surrounding a sale to determine if there were "special circumstances" that may have had impacted the sale price without affecting its true value. Ibid. See also L. Bamberger & Co. v. Division of Tax Appeals, 1 N.J. 151 (1948); Almax Builders, Inc. v Perth Amboy, 1 N.J. Tax 31 (1980); WCI-Westinghouse, Inc. v. Edison Twp., 7 N.J. Tax 610 (Tax 1985). Moreover, a taxing district is free to over rebuttal evidence that the sale was not arm's length, was a hardship sale, or was deceptive. Glen Wall Associates, 99 N.J. at 282. Here, credible testimony was offered that Lot 19 was actively marketed for sale, the Contract of Sale for Lot 19 was entered into in February 2016, and Lot 19 was sold on August 25, 2016, Braemar did not sell Lot 19 out of distress or hardship, and the sale was not a sham. Therefore, the court concludes that the August 25, 2016 sale of Lot 19 offered meaningful insight into its value as of the October 1, 2015 valuation date.

for physical condition.  The adjusted prices of the ten comparable single-family home sales range from $332,475 to $450,000.

According to the expert, based on his review of data published by the National Association of Realtors, average home prices in West Milford "fell between January 2008 . . . and October 2015 . . . at an annualized rate of 3%."  In addition, the expert performed a paired sales analysis of two single-family homes which were purchased and resold during the valuation periods.  That analysis demonstrated that West Milford experienced a home price decline from 2009 to 2013 of 1.5% per year; and a home price increase from 2013 to 2015 of 4.5% per year.  However, this data contrasted with a drop of 6% in the West Milford average home price between 2013 and 2015 as reported by the National Association of Realtors and data from the S&P Case Shiller 20-City Composite Home Price Index.  Thus, in the expert's opinion, a 2% per year, downward time/market condition adjustment was warranted to each of the single-family home sales.

In addition, the expert applied a downward 10% location adjustment to comparable sales 2, 3, and 9 due to their proximity to highway access.  In the expert's opinion, based on his review and analysis of the ten comparable single-family home sales, the sale prices of comparable 2, 3, and 9 were elevated by approximately 10% in comparison to the other properties, based on its superior highway access.  Thus, the expert applied a downward 10% adjustment to account for the locational differences between the properties.

Cross examination disclosed that the gross living area and room count for each comparable single-family home proffered by the expert was obtained from the "multiple listing sheet" or the www.NJACTB.org website.  Admittedly, the expert did not inspect the interior of any of the comparable sales and did not review the property record cards for any of the comparable sales.  Instead, the expert relied exclusively on the multiple listing disclosures for the reported number of

35

bedrooms and bathrooms in each property. Although the expert offered testimony during direct examination that he conferred with the listing realtor for each comparable sale, cross-examination revealed that his discussions were limited to whether the information set forth on the multiple listing was accurate, rather than confirming the detailed information about each property, the source of such information, or any of the transaction terms.

Significantly, cross-examination further disclosed that in the expert's opinion, he did not "think that the market relies on living area as a standard when buying a house, what they look at is the design of the home, the number of rooms and when it was constructed, and that's what I looked at here."[24] In the expert's opinion "whether someone uses a second floor room as a bedroom or a den, how it's used, I'm going to consider it a bedroom, because it's on the second floor, and the same thing with a first floor room, whether it's used as a den, or an office, or a bedroom, that's up to the user, the fact that the space is there and its typically counted as a bedroom." Thus, if the multiple listing misidentified or mischaracterized a room as a bedroom when the room was actually a loft, a den or an office, the expert nevertheless treated it as a bedroom in making his size adjustments. Consequently, the expert's size adjustments were based solely on the number of available bedrooms reported on the "multiple listing sheet" or the www.NJACTB.org website.

Moreover, the expert applied an upward 10% adjustment, per bedroom, to each comparable sale without regard to the total livable square footage of the residence. For example, if a comparable sale had approximately 1,700 square feet less living area, but consisted of an identical

---

[24] The expert offered testimony that he obtained the gross living area square footage of each comparable single-family dwelling from either the property's multiple listing or the NJACT.org website.

number of bedrooms, the expert applied no size adjustment. Conversely, if the comparable sale was approximately 1,700 square feet smaller, but consisted of one less bedroom, the expert applied a 10% upwards size adjustment. Additionally, if the comparable sale possessed one less bedroom, but had a greater number of bathrooms, the expert applied a 10% upwards adjustment for the bedroom only, and made no adjustment for the additional bathroom or partial bathroom.[25]

Here, cross-examination disclosed that comparable sale 1 was approximately 2,500 square feet or 32% smaller than the subject property; comparable sale 4 was approximately 2,674 square feet or 27% smaller than the subject property; comparable sale 5 was approximately 1,968 square feet or 45% smaller than the subject property; comparable sale 6/8 was approximately 2,710 square feet or 25% smaller than the subject property; and comparable sale 9 was approximately 1,932 square feet or 45% smaller than the subject property. While the expert made a 10% upwards size adjustment to comparable sales 1, 4, 5, and 6/8, the expert made no size adjustment to comparable sale 9. Accordingly, while comparable sale 5 and comparable sale 9 were similar in size and were approximately 45% smaller than the single-family home on Lot 19, they received disparate adjustments.

During cross-examination the expert further acknowledged that comparable sales 4 and 6/8 were located on more heavily traveled roads than the single-family home on Lot 19, with comparable sale 4 also being located in close proximity to a bar/pub. However, the expert applied no adjustments to comparable sales 4 and 6/8 to account for the differences in vehicular traffic.

---

[25] The expert offered testimony that he considered the number of bathrooms in making his adjustments, however his actual adjustments did not support his testimony. Comparable sale 4 consisted of 3 bedrooms and 3 bathrooms, in comparison to the single-family dwelling constructed on Lot 19, which consisted of 4 bedrooms and 2.5 bathrooms. The expert applied an upwards 10% size adjustment to comparable 4 to account for a lesser amount of bedrooms, but made no downward adjustment to account for the presence of another full bathroom.

Additionally, during cross-examination the expert acknowledged that the single-family home identified as comparable 4 is a split-level styled home, and not a colonial styled home like the single-family home on Lot 19. Moreover, the expert acknowledged that comparable sale 5 was identified on West Milford's tax assessor's property record card as a bi-level home, and not as a colonial styled home like the single-family home on Lot 19. In the expert's opinion, based on his exterior view of comparable sale 5, it appeared to be a colonial styled home, however the expert conducted no interior inspection of the property and did not know how the interior of the comparable sale 5 was composed and made no inquiry of the listing broker regarding the composition of the home.

After having considered all of the evidence and testimony presented by the expert, the court concludes that an adequate record exists for the expert's time/market condition adjustments. In addition, the court finds the expert's location adjustments to comparable sales 2, 3, and 9 to be reasonable and supported by the evidence and testimony introduced during trial.

However, effective cross-examination disclosed that the expert's bedroom count adjustments lack any authoritative support steeped in objective market data, rendering those adjustments inherently unreliable. Additionally, the expert's use of the bedroom count adjustment resulted in an inconsistent application of size adjustments. As highlighted during cross-examination, the expert applied a 10% upwards size adjustment to comparable sale 5, however made no size adjustment to comparable sale 9 despite the fact that both properties are almost identical in size. Moreover, the expert's sole focus on a bedroom adjustment failed to account for differences that existed in the number of bathrooms in a property. For instance, the expert applied the identical 10% upwards size adjustment to comparable sales 4 and 8, despite the fact that comparable sale 4 contains an additional half bathroom. Stated differently, the expert's sole focus

on a bedroom unit of comparison failed to account for other interior elements and components that may have impacted value, including gross living area and the number of available bathrooms. Instead, the expert compared the total number of bedrooms and made a unit adjustment of 10%, without accounting for any variations or differences in room size or gross living area square footage.

Moreover, the expert failed to verify with any transaction participant that the "multiple listing sheet[s]" accurately reported the actual number of bedrooms in each property. The expert offered no treatise, writings or authority supporting his adjustments founded on a bedroom count unit of comparison. Although an appraiser is afforded deference in determining the appropriate units of comparison, the applied adjustment units must be supported by studies or credible market derived data, and not simply subjective beliefs. The barometer of a single-family home's utility is often measured in terms of its size and the functionality it affords its occupants, not by the presence of an additional room, with no regard to considerations of size. In our quest for resolving the issue of true market value, we must not forget that the prime function to be accomplished by a single-family home is satisfaction of the living space requirements of its occupants. An analysis that relies solely on bedroom count, without consideration of dwelling size, the number of bathrooms or other interior components, does not provide a proper correlation to utility and value. Here, the expert made the same 10% upwards adjustment, per bedroom, with no regard to the size or utility of the other homes. Thus, for the reasons set forth herein, the court finds the expert's bedroom count adjustment not credible. Additionally, as highlighted above, comparable sales 1, 4, 5, 6/8, and 9 contained between 25% and 45% less living area than the single-family home on Lot 19. Thus, the court does not find them similar or comparable with the single-family home on Lot 19. Accordingly, because the expert did not furnish the court with a credible formula to gauge how

the size differences should be accounted for, the court rejects comparable sales 1, 4, 5, 6/8, and 9, as not being comparable to and competitive in the marketplace with the subject property.

Accepting the expert's comparable sales 2, 3, 7, and 10, as comparable to and competitive in the marketplace with the single-family home on Lot 19, as well as the expert's adjustments for time/market conditions and location, results in a concluded value for the single-family home on Lot 19 as follows: (1) as of the October 1, 2009 valuation date, $431,000; (2) as of the October 1, 2010 valuation date, $429,000; (3) as of the October 1, 2011 valuation date, $421,000; (4) as of the October 1, 2012 valuation date, $412,000; (5) as of the October 1, 2013 valuation date, $425,000; (6) as of the October 1, 2014 valuation date, $425,000; and (7) as of the October 1, 2015 valuation date, $425,000.

2. Reconciliation

Having concluded the true or fair market value of Lots 14, 19, 20, and 23, the court will compute the correct local property tax assessments for the subject property for the 2010, 2011, 2012, 2013, 2014, 2015, and 2016 tax years.

Under N.J.S.A. 54:51A-6(a), commonly referred to as Chapter 123, when the court is satisfied in a non-revaluation year by the evidence presented "that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property. . . ." N.J.S.A. 54:51A-6(a). This process involves application of the Chapter 123 common level range. N.J.S.A. 54:1-35a(b). When the ratio of assessed value exceeds the upper limit or falls below the lower limit, the formula for determining the revised taxable value of property, under N.J.S.A. 54:51A-6(a), is as follows:

True market value     x     Average ratio  =     Revised taxable value

40

a. Lots 14, 20 and 23

For the 2010 tax year, application of the Chapter 123 ratio results in an applied upper limit of .4689 and lower limit of .3465. The ratio of total assessed value $460,200, to true market value $925,000, yields a ratio of 0.4975%, which exceeds the applied upper limit. Consequently, the calculation and total tax assessment for Lots 14, 20 and 23, for the 2010 tax year is:

$925,000    x    .4077  =    $377,100 [ROUNDED]

For the 2011 tax year, application of the Chapter 123 ratio results in an applied upper limit of .50 and lower limit of .3696. The ratio of total assessed value $460,200, to true market value $925,000, yields a ratio of 0.4975%, which falls within the Chapter 123 corridor. Accordingly, no adjustment to the 2011 tax assessment for Lots 14, 20 and 23 is warranted.

For the 2012 tax year, West Milford completed and implemented a municipal-wide revaluation. Accordingly, N.J.S.A. 54:51A-6 is inapplicable, and Lots 14, 20 and 23 should be assessed at 100% of their true market value. See Elrabie v. Borough of Franklin Lakes, 24 N.J. Tax 158, 180 (Tax 2008). Consequently, the total tax assessment for Lots 14, 20 and 23 for the 2012 tax year is $275,000.

For the 2013 tax year, application of the Chapter 123 ratio results in an applied upper limit of 1.0339 and lower limit of .7641. The ratio of total assessed value, $1,056,800, to true market value, $275,000, yields a ratio of 3.843%, which exceeds the applied upper limit. Consequently, the calculation and total tax assessment for Lots 14, 20 and 23, for the 2013 tax year is:

$275,000    x    .8990  =    $247,200 [ROUNDED]

For the 2014 tax year, application of the Chapter 123 ratio results in an applied upper limit of 1.0686 and lower limit of .7898. The ratio of total assessed value, $1,056,800, to true market

value, $925,000, yields a ratio of 1.142%, which exceeds the applied upper limit.  Consequently, the calculation and total tax assessment for Lots 14, 20 and 23, for the 2014 tax year is:

$925,000    x    .9292  =    $859,500 [ROUNDED]

For the 2015 tax year, application of the Chapter 123 ratio results in an applied upper limit of 1.0956 and lower limit of .8098.  The ratio of total assessed value, $1,056,800, to true market value, $925,000, yields a ratio of 1.142%, which exceeds the applied upper limit.  Consequently, the calculation and total tax assessment for Lots 14, 20 and 23, for the 2015 tax year is:

$925,000    x    .9527  =    $881,200 [ROUNDED]

For the 2016 tax year, application of the Chapter 123 ratio results in an applied upper limit of 1.0389 and lower limit of .7679.  The ratio of total assessed value, $1,056,800, to true market value, $675,000, yields a ratio of 1.565%, which exceeds the applied upper limit.  Consequently, the calculation and total tax assessment for Lots 14, 20 and 23, for the 2016 tax year is:

$675,000    x    .9034  =    $609,800 [ROUNDED]

b.  Lot 19

For the 2010 tax year, application of the Chapter 123 ratio results in an applied upper limit of .4689 and lower limit of .3465. The ratio of total assessed value $343,100, to true market value, $431,000, yields a ratio of .7961%, which exceeds the applied upper limit. Consequently, the calculation and total tax assessment for Lot 19 for the 2010 tax year is:

$431,000    x    .4077  =    $175,700 [ROUNDED]

For the 2011 tax year, application of the Chapter 123 ratio results in an applied upper limit of .50 and lower limit of .3696.  The ratio of total assessed value $343,100, to true market value $429,000, yields a ratio of 0.7998%, which exceeds the applied upper limit.  Consequently, the calculation and total tax assessment for Lot 19 for the 2011 tax year is:

$429,000     x     .4348 =     $186,500 [ROUNDED]

For the 2012 tax year, West Milford completed and implemented a municipal-wide revaluation. Accordingly, N.J.S.A. 54:51A-6 is inapplicable, and Lot 19 should be assessed at 100% of its true market value. See Elrabie v. Borough of Franklin Lakes, 24 N.J. Tax 158, 180 (Tax 2008). Consequently, the total tax assessment for Lot 19 for the 2012 tax year is $421,000.

For the 2013 tax year, application of the Chapter 123 ratio results in an applied upper limit of 1.0339 and lower limit of .7641. The ratio of total assessed value $628,200, to true market value $412,000, yields a ratio of 1.524%, which exceeds the applied upper limit. Consequently, the calculation and total tax assessment for Lot 19 for the 2013 tax year is:

$412,000     x     .8990 =     $370,400 [ROUNDED]

For the 2014 tax year, application of the Chapter 123 ratio results in an applied upper limit of 1.0686 and lower limit of .7898. The ratio of total assessed value $628,200, to true market value, $425,000, yields a ratio of 1.478%, which exceeds the applied upper limit. Consequently, the calculation and total tax assessment for Lot 19 for the 2014 tax year is:

$425,000     x     .9292 =     $394,900 [ROUNDED]

For the 2015 tax year, application of the Chapter 123 ratio results in an applied upper limit of 1.0956 and lower limit of .8098. The ratio of total assessed value, $628,200, to true market value, $425,000, yields a ratio of 1.478%, which exceeds the applied upper limit. Consequently, the calculation and total tax assessment for Lot 19 for the 2015 tax year is:

$425,000     x     .9527 =     $404,900 [ROUNDED]

For the 2016 tax year, application of the Chapter 123 ratio results in an applied upper limit of 1.0389 and lower limit of .7679. The ratio of total assessed value $628,200, to true market

43

value $425,000, yields a ratio of 1.478%, which exceeds the applied upper limit. Consequently, the calculation and total tax assessment for Lot 19 for the 2016 tax year is:

$$\$425,000 \quad \times \quad .9034 \quad = \quad \$383,900 \text{ [ROUNDED]}$$

Pursuant to R. 8:9-3, the court shall afford the parties until October 11, 2019 to submit a mutually agreed upon allocation of the local property tax assessments for Lots 14, 19, 20 and 23 as of each valuation date at issue, in accordance with the court's opinion. If the parties are unable to agree upon the allocation of the local property tax assessments for Lots 14, 19, 20 and 23 as of each valuation date at issue then, pursuant to R. 8:9-4, the parties shall submit proposed computations to the court, on notice to their adversary, by no later than October 18, 2019.

Very truly yours,


Hon. Joshua D. Novin, J.T.C.

44